## UNITED STATES *v.* LAUDANI.

No. 71. Argued December 16, 1943.—Decided January 3, 1944.

*Mr. Chester T. Lane,* with whom *Solicitor General Fahy, Assistant Attorney General Tom C. Clark,* and *Messrs. Edward G. Jennings, W. Marvin Smith, Douglas B. Maggs,* and *Irving J. Levy* were on the brief, for the United States.

*Mr. Harold Simandl* submitted for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

Indictments returned in a United States District Court in New Jersey charged that the respondent Laudani, while acting as a company foreman with authority to employ and discharge workers on a public works project financed in part by the United States, had contrary to § 1 of an Act of June 13, 1934,[1] forced certain of his subordinates to give him part of their wages in order to keep their jobs. Laudani moved to quash, assigning as one ground that the indictments failed to charge conduct prohibited by this Act since they did not contain allegations that he was the employer of the coerced men or that he had acted as agent of the employer in forcing the payments. The gist of his contention was that the prohibition of the Act extends only to employers and persons who act in concert with them. The District Court concluded that the Act applied to a foreman such as Laudani, overruled his motion, and a jury convicted him. The Circuit Court of Appeals accepted Laudani's contention, reversed the judgment, and directed that the indictments be quashed. 134 F. 2d 847. The public importance of the question presented prompted us to grant certiorari.

Both the language and history of the Kickback Act argue against the conclusion that Congress intended its prohibition to apply only to employers and not to foremen who exercise many of the powers of employers. The Act

---

[1] This Act is commonly known as the "Kickback" Act. Section 1 provides that, "Whoever shall induce any person employed in the construction, prosecution, or completion of any public building, public work, or building or work financed in whole or in part by loans or grants from the United States, or in the repair thereof to give up any part of the compensation to which he is entitled under his contract of employment, by force, intimidation, threat of procuring dismissal from such employment, or by any other manner whatsoever, shall be fined not more than $5,000, or imprisoned not more than five years, or both." 48 Stat. 948; U. S. C. Title 40, § 276b.

punishes "whoever" shall induce any person employed on a federally financed work "to give up any part of the compensation to which he is entitled under his contract of employment" by "force, intimidation, threat of procuring dismissal from such employment, or by any other manner whatsoever." [2]   The sweep of the word "whoever," if that word stood alone, would be wide enough to include not only an employer but any other person.   And the coercive methods of inducement expressly prohibited by the Act are methods in which at least some persons other than employers could engage without legal cause or excuse.

The Circuit Court of Appeals pointed out, however, that if the word "whoever" be given its broadest scope the Act might include common blackmailers who have no relationship to their victims' employment.   In an effort to avoid what it considered to be such an extreme application of the Act, the Court focused attention on the clause "to give up any part of the compensation to which he is entitled under his contract of employment."   Viewing this clause as proof that the purpose of Congress was to protect the employees' contractual rights to receive wages from their employer, the Court reasoned that no one but the employer or one acting on his behalf possessed "the requisite privity of contract" with the employees to be capable of impairing these rights.   Having thus emphasized the Congressional reference to a "contract of employment," the Court stated broadly that, "What happens to the compensation after the employee has received it in full, and wholly without relation to or effect upon his contract of employment, is a matter with which this statute does not purport to deal."

The Court's statement might have been pertinent had the indictments here been against a common blackmailer, extortioner, or some other person not alleged to have been

---

[2] *Ibid.*

vested by the employer with power to fix and terminate the employer-employee status. But we think that the coerced surrender of wages by employees at the instance of a company foreman given authority by his employer to hire and discharge them cannot properly be said to bear no relation to or have no effect upon their contracts of employment, especially where, as here alleged, the surrender of wages was induced by the foreman's express threat to dismiss all employees who did not comply with his demand. Execution of such a threat against employees unwilling to pay would immediately and completely have terminated their employment contracts. We find nothing in the Act which suggests that, under these circumstances, a foreman must be deemed incapable of violating its provisions merely because he may not stand in that relationship to employees which the Circuit Court characterized as "privity of contract."

The purpose of the Act under consideration is to extend protection not merely to the legal form of employment contracts but to the substantive rights of workers actually to receive the benefit of the wage schedules which Congress has provided for them. The evil aimed at was the wrongful deprivation of full work payments. The Act was adopted near the bottom of a great business depression as one part of a broad Congressional program the goal of which was to strengthen the domestic economy by increasing the purchasing power of the nation's consumers. To this end, Congress enacted legislation designed to relieve widespread unemployment and enable working people to earn just and reasonable wages. A large program for federal financing of public works was established,[3] and legislation was passed requiring gov-

---

[3] The grant of money for the work on which Laudani was employed was authorized by Title II of the National Industrial Recovery Act enacted June 16, 1933, near the bottom of the depression. Section 1 of this Act declared that the policy of Congress was ". . . to increase

ernment contractors to pay certain minimum wage rates.[4] It was the purpose of the Kickback Act to assure that the federal funds thus provided for workers should actually be received by them for their own use except where diverted under authority of law or a worker's voluntary agreement.[5]

In view of this background, we cannot hold that Congress intended to exclude from the Act's proscription a foreman with the authority Laudani is alleged to have possessed. Foremen vested with full power to employ and discharge subordinates could frustrate the objective of the Act just as effectively as could their employers, and foremen not given such broad powers might nevertheless be able to use their authority to accomplish the same result. That foremen not only could but might do this very thing was testified at Senate hearings when the

the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources." 48 Stat. 195.

[4] Title II, § 206, of the National Industrial Recovery Act of June 16, 1933, provides in part that, "All contracts let for construction projects and all loans and grants pursuant to this title shall contain such provisions as are necessary to insure . . . that all employees shall be paid just and reasonable wages which shall be compensation sufficient to provide, for the hours of labor as limited, a standard of living in decency and comfort . . ." 48 Stat. 204–205; U. S. C. Title 40, § 406. See also an Act of March 3, 1931, as amended, commonly known as the Davis-Bacon Act, 46 Stat. 1494; 49 Stat. 1011; 54 Stat. 399; U. S. C. Title 40, §§ 276a–276a–5; *Perkins* v. *Lukens Steel Co.*, 310 U. S. 113, 128.

[5] See Report of the House Committee on the Judiciary on Bill S. 3041, H. Rep. No. 1750, 73d Cong., 2d Sess. The report printed a letter from the Federal Emergency Administrator of Public Works, Harold L. Ickes, which urged immediate passage of the bill "to prevent a very prevalent evil in the construction industry which, to the extent that it exists on Public Works projects, defeats the purpose of Title II of the National Industrial Recovery Act and the success of our Public Works program."

problem of "kickbacks" was under study.[6]  And the members of the Senate Committee on the Judiciary reporting the bill used language broad enough to include foremen among others when they said that hearings had revealed, "that large sums of money have been extracted from the pockets of American labor, to enrich contractors, subcontractors, and their officials." [7]

To hold that a company foreman vested with sufficient power substantially to affect his subordinates' contracts of employment is within the Act's proscription is not to hold that the Act applies to every extortioner, blackmailer, or other person who extracts money from one who has previously received it for labor on a federally financed project.  We need not, at this time, attempt to delineate the outside scope of the Act's application.  But the purpose of the legislation, no less than its language, shows that the power to employ and discharge brings an employing company's foreman within its prohibition.

The judgment of the Circuit Court of Appeals is reversed, and the cause is remanded to that court for consideration and disposition of other questions not here involved.

*Reversed.*

---

[6] See, for example, Hearings, Subcommittee of Senate Committee on Commerce, S. Res. 74, 73d Cong., 2d Sess., Vol. I, pp. 790–792, 801, 826.

[7] S. Rep. No. 803, 73d Cong., 2d Sess.