UNITED STATES of America,
Appellant,

v.

Jackie WHITE, Appellee.

No. 74–1283.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 11, 1974.

Decided Dec. 9, 1974.

Rehearing and Rehearing En Banc
Denied Feb. 11, 1975.

Donald F. Parr, Asst. U. S. Atty., Minneapolis, Minn., for appellant.

Rodney J. Edwards, Duluth, Minn., for appellee.

Before LAY, ROSS and WEBSTER, Circuit Judges.

ROSS, Circuit Judge.

Jackie White, a member of the Red Lake Band of Chippewa Indians and resident of the Red Lake Reservation, was observed shooting at a bald eagle within the confines of the reservation. He was thereupon charged with the unlawful taking of a bald eagle in violation of 16 U.S.C. § 668(a). White moved for dismissal of the Information on the grounds that 16 U.S.C. § 668 was inapplicable to tribal Indians on Indian reservations exercising traditionally guaranteed tribal hunting rights. Based upon the congressional silence which underlies the statute's enactment and upon United States v. Cutler, 37 F.Supp. 724 (D.Idaho 1941), the trial court granted the motion to dismiss. Under the provisions of 18 U.S.C. § 3731, the government appeals the dismissal. We affirm.

In the district court the government opposed the dismissal of the Information on the basis that 18 U.S.C. § 1152 established the requirement that an Act of Congress is applicable to Indians unless expressly provided otherwise. Before this Court, the government has taken the position that 16 U.S.C. § 668 expressly deals with Indians and thus is plainly and unmistakenly applicable to Indians on their native reservations in the exercise of their right to hunt.

18 U.S.C. § 1152 provides:

Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

A review of the history of these provisions reveals that the statute is limited to the application of federal enclave law to Indian country. In Ex parte Gonshay-ee, 130 U.S. 343, 352, 9 S.Ct. 542, 545, 32 L.Ed. 973 (1889), the Supreme Court noted:

"[W]ithin the exclusive jurisdiction of the United States," [as used in the precursor statute to § 1152] is well understood as applying to the crimes which are committed within the premises, grounds, forts, arsenals, navy-yards, and other places within the boundaries of a State . . . over which the Federal government has . . . exclusive jurisdiction.

Again, In re Wilson, 140 U.S. 575, 578, 11 S.Ct. 870, 871, 35 L.Ed. 513 (1891), the Court said:

The words "sole and exclusive," in [the precursor statute to § 1152] . . . are only used in the description of the laws which are extended to [Indian country].

■ Those cases impart that 18 U.S.C. § 1152 is not a predicate for general federal criminal jurisdiction in Indian country. Rather the scope of section 1152 is limited to the applicability or nonapplicability of federal enclave laws, those laws passed by the federal government in the exercise of its police powers over federal property and now defined in the United States Criminal Code in terms of "special maritime and territorial jurisdiction of the United States," 18

U.S.C. § 7. *See* Stone v. United States, 506 F.2d 561 (8th Cir., 1974); Walks On Top v. United States, 372 F.2d 422, 425 (9th Cir.), cert. denied, 389 U.S. 827, 88 S.Ct. 109, 19 L.Ed.2d 170 (1967). 18 U.S.C. § 1152, then, is not germane to this controversy.

■ The government's second argument is equally nonpersuasive. In general, there is no question that "Congress has full power to legislate concerning the tribal property of the Indians . . . .", Tiger v. Western Investment Co., 221 U.S. 286, 311–312, 31 S.Ct. 578, 585, 55 L.Ed. 738 (1911). *See also* FPC v. Tuscarora Indian Nation, 362 U.S. 99, 116, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960). However, areas traditionally [1] left to tribal self-government, those most often the subject of treaties, have enjoyed an exception from the general rule that congressional enactments, in terms applying to all persons, includes Indians and their property interests.[2]

1. This tradition has been explained in various Supreme Court opinions: "In the early years, as the white man pressed against Indians in the eastern part of the continent, it was the policy of the United States to isolate the tribes on territories of their own beyond the Mississippi, where they were quite free to govern themselves." Organized Village of Kake v. Egan, 369 U.S. 60, 71, 82 S.Ct. 562, 569, 7 L.Ed.2d 573 (1962). In the opinions of the early cases the Indians "are spoken of as 'wards of the nation,' 'pupils,' as local dependent communities. In this spirit the United States . . . conducted its relations to them from its organization to [the 1880's]." United States v. Kagama, 118 U.S. 375, 382, 6 S.Ct. 1109, 1113, 30 L.Ed. 228 (1886). As the United States spread westward, "it became evident that there was no place where the Indians could be forever isolated. In recognition of this fact the United States began to consider the Indians less as foreign nations and more as a part of our country." Organized Village of Kake v. Egan, *supra*, 369 U.S. at 72, 82 S.Ct. at 569. However, the United States always "recognized in the Indians a possessory right to the soil over which they roamed and hunted and established occasional villages." United States v. Kagama, *supra*, 118 U.S. at 381, 6 S.Ct. at 1112.

In 1871, the power to make treaties with the Indian tribes was abolished, 16 Stat. 544, 566, 25 U.S.C. § 71. In 1887 Congress passed the General Allotment Act, 24 Stat. 388, as amended, 25 U.S.C. §§ 331–358, authorizing the division of reservation land among individual Indians with a view toward their eventual assimilation into our society. Organized Village of Kake v. Egan, *supra*, 369 U.S. at 72, 82 S.Ct. at 562. However, the "policy of assimilation was reversed abruptly in 1934." *Id.* at 73, 82 S.Ct. at 569. The Reorganization Act of 1934 "reflected a new policy of the Federal Government . . . and tribes were encouraged to revitalize their self-government . . . ." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 151, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114 (1973). The Court has recently reaffirmed the policy favoring tribal self-government. In

McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 172–173, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973), the Court stated:

The Indian sovereignty doctrine is relevant, then, . . . because it provides a backdrop against which the applicable treaties and federal statutes must be read. It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our Government. . . . But it is nonetheless still true, as it was in the last century, that ". . . They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations . . . as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union . . . . ."

*Id.* (citations omitted).

2. In FPC v. Tuscarora Indian Nation, *supra*, 362 U.S. at 123, 80 S.Ct. at 557, the Court was careful to note that the language of the congressional enactments specifically dealt with Indian property and that the "lands in question [were] not subject to any treaty between the United States and the Tuscaroras." In Squire v. Capoeman, 351 U.S. 1, 6, 76 S.Ct. 611, 100 L.Ed. 883 (1956), treaty provisions operated to relieve Indians of tax liability where no specific abrogation of treaty rights were expressed in the tax statute, despite the general disfavor of unexpressed exemptions from tax burdens. In Department of Game of Washington v. Puyallup Tribe, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) [*Puyallup II*], the Court permitted state regulation of the *manner* of exercising a nonexclusive treaty right which had not been abrogated by Congress only after previously holding that the treaty was silent on that issue, Puyallup Tribe v. Department of Game of Washington, 391 U.S. 392, 398, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) [*Puyallup I*], and that the treaty guaranteed rights, themselves, could not be qualified or conditioned, *id.* at 399, 88 S.Ct. 1725.

■ This tradition is embraced in the *Menominee* doctrine which, simply stated, is: "While the power to abrogate [treaty recognized hunting] rights exists . . . 'the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress.'" Menominee Tribe of Indians v. United States, 391 U.S. 404, 412–413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968). This doctrine governs the disposition of this case and is based upon well-established rules of construction. "Plenary authority over the tribal relations of the Indians ha[d] been exercised by Congress from the beginning . . . . Until the year 1871 the policy was pursued of dealing with the Indian tribes by means of treaties, and, of course, a moral obligation rested upon Congress to act in good faith in performing the stipulations entered into on its behalf." Lone Wolf v. Hitchcock, 187 U.S. 553, 565–566, 23 S.Ct. 216, 221, 47 L.Ed. 299 (1903). Treaty rights could be abrogated at the will of Congress. Choate v. Trapp, 224 U.S. 665, 671, 32 S.Ct. 565, 56 L.Ed. 941 (1912). An Act of Congress may supersede a treaty. Thomas v. Gay, 169 U.S. 264, 271, 18 S.Ct. 340, 42 L.Ed. 740 (1898); The Cherokee Tobacco, 78 U.S. 616, 621, 11 Wall. 616, 20 L.Ed. 227 (1870). Generally, in the case of a conflict between an Act of Congress and a treaty, the one last in date must prevail. Hijo v. United States, 194 U.S. 315, 324, 24 S.Ct. 727, 48 L.Ed. 994 (1904). However, a treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed. Cook v. United States, 288 U.S. 102, 120, 53 S.Ct. 305, 77 L.Ed. 641 (1933). Thus the later Act should be harmonized with the letter and spirit of the treaty so far as that reasonably can be done, since the intention to alter, and, pro tanto, abrogate, the treaty is not to be lightly attributed to Congress. United States v. Payne, 264 U.S. 446, 448, 44 S.Ct. 352, 68 L.Ed. 782 (1924). The policy was best expressed in Lone Wolf v. Hitchcock, *supra*, 187 U.S. at 566, 23 S.Ct. at 221, where the Court said:

The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the *power* to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians.

■ Upon a review of the tribal history of the Red Lake Band of Chippewa Indians,[3] it is clear that a tract of land was "reserved" in a treaty for their occupation, Chippewa Indians v. United States, 301 U.S. 358, 373, 57 S.Ct. 826, 81 L.Ed. 1156 (1937); that the occupied lands were thereafter regarded by the United States as constituting the · Red

**3.** This history is recounted in Chippewa Indians v. United States, 301 U.S. 358, 57 S.Ct. 826, 81 L.Ed. 1156 (1937), and can be summarized as follows: About the beginning of the last century the Chippewa Indians constituted one of the larger Indian tribes in the northerly part of the United States. In the early treaties they were dealt with as a single tribe. In later treaties they were regarded as divided into distinct bands, of which twelve such bands became recognized occupants and holders of twelve separate reservations in Minnesota. One of the bands in Minnesota was the Red Lake Band which, along with the Pembi-

na Band, had been the exclusive occupants of the Red Lake geographical areas.

By treaty of October 2, 1863, 13 Stat. 667, the United States negotiated an agreement with the Red Lake and Pembina Bands whereby these bands ceded to the United States a described part of the lands then "owned and claimed by them." In Article 6 of the treaty the lands not ceded were called "the reservation," and thereafter were regarded by the United States and the Indians as constituting the Red Lake Reservation. *Id.* at 373, 57 S.Ct. at 832.

Lake Reservation, *id.*, United States v. Holt State Bank, 270 U.S. 49, 58, 46 S.Ct. 197, 70 L.Ed. 465 (1926), Minnesota v. Hitchcock, 185 U.S. 373, 389–390, 22 S.Ct. 650, 46 L.Ed. 954 (1902);[4] and that the Red Lake bands were recognized as the sole owners by right of original Indian occupancy.[5] That manner of occupation ["as Indian lands"] in Menominee Tribe of Indians v. United States, *supra*, 391 U.S. at 406, 88 S.Ct. 1705, was sufficiently definite to create a treaty right to hunt and fish. With specific reference to the Red Lake Band, the leading source in this area cites:

"An examination of the various treaties between the United States and the Chippewa Indians discloses that while the right in the Indians to hunt and fish on ceded lands was reserved in some of the earlier treaties (see Article 5, Treaty of July 20, 1837, 7 Stat. 536; Article 2, Treaty of October 4, 1842, 7 Stat. 591; and Article 11, Treaty of September 30, 1854, 10 Stat. 1109), no reservation of the right to hunt and fish was made with respect to the unceded lands of the Red Lake Reservation. But such a reser-

vation was not necessary to preserve the right on the lands reserved or retained in Indian ownership. The right to hunt and fish was part of the larger rights possessed by the Indians in the lands used and occupied by them. Such right, which was 'not much less necessary to the existence of the Indians than the atmosphere they breathed' remained in them unless granted away." United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089.

Cohen, Federal Indian Law, 496–497 (2d ed. 1958) (citing Op. Acting Sol. M 28107, June 30, 1936). Based upon *Menominee, Chippewa, Hitchcock,* and *Winans,* we reach the inescapable conclusion that the Red Lake Band of Chippewa Indians enjoy a right to hunt on the Red Lake Reservation and that this right has been implicitly recognized in treaties negotiated by that band and the United States. To affect those rights, then, by 16 U.S.C. § 668, it was incumbent upon Congress to expressly abrogate or modify the spirit of the relationship between the United States and Red Lake Chippewa Indians

4. In Minnesota v. Hitchcock, *supra*, 185 U.S. at 389–390, 22 S.Ct. at 657 the Supreme Court said:

While there was no formal action in respect to the remaining tract, the effect was to leave the Indians in a distinct tract reserved for their occupation, and in the same act this tract was spoken of as a reservation. Now, in order to create a reservation it is not necessary that there should be a formal cession or a formal act setting apart a particular tract. It is enough that from what has been done there results a certain defined tract appropriated to certain purposes. Here the Indian occupation was confined by the treaty to a certain specified tract. That became, in effect, an Indian reservation.

*See also* Spalding v. Chandler, 160 U.S. 394, 403–404, 16 S.Ct. 360, 40 L.Ed. 469 (1896). Similarly in United States v. Holt State Bank, *supra*, 270 U.S. at 58, 46 S.Ct. at 200, the Court said, "The effect of what was done [by the 1863 treaty] was to reserve in a general way for the continued occupation of the Indians what remained of their aboriginal territory . . . ."

5. By an Act of Congress, Act of January 14, 1889, 25 Stat. 642, Congress proposed a plan

for allotment of the various Chippewa reservations. The Act created a commission to negotiate with the various bands. In instructions issued to the Commission by the Commissioner of Indian Affairs, it was said: None but the Red Lake and Pembina bands have ever claimed an interest in said [Red Lake] reservation, and said bands have always been recognized as the sole owners *by right of original Indian occupancy.* The minutes of the negotiations between the Commission and the Indians of the Red Lake Reservation under the Act, demonstrate that the Commission assured these Indians that the land which would ultimately belong to them and their children would be reserved for them and their descendants *for all purposes* and that no other Indians would have any right therein. Chippewa Indians v. United States, *supra*, 301 U.S. at 366–367, 57 S.Ct. 826.

Chippewa Indians v. United States, *supra*, was subsequently cited by the Supreme Court as an example of congressional recognition of the Indian right of permanent occupancy, evidenced by "the definite intention . . . to accord legal rights, not merely permissive occupation." Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 277–279, 75 S.Ct. 313, 317, 99 L.Ed. 314 (1955).

on their native reservation. We do not believe it has done so.

16 U.S.C.A. § 668(a) provides:

> Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in sections 668 to 668d of this title, shall knowingly, or with wanton disregard for the consequences of his act take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to sections 668 to 668d of this title, shall be fined not more than $5,000 or imprisoned not more than one year or both: . . .

The only reference in the Act which could be said to specifically make the Act applicable to the defendant in this case is in a subsequent section:

> Whenever, after investigation, the Secretary of the Interior shall determine that it is compatible with the preservation of the bald eagle or the golden eagle to permit the taking, possession, and transportation of specimens thereof for the scientific or exhibition purposes of public museums, scientific societies, and zoological parks, *or for the religious purposes of Indian tribes*, or that it is necessary to permit the taking of such eagles for the protection of wildlife or of agricultural or other interests in any particular locality, may authorize the taking of such eagles pursuant to regulations which he is hereby authorized to prescribe:
>
> . . .

16 U.S.C. § 668a (emphasis added). This latter section was incorporated into the Act with the 1962 revisions to extend protection to golden eagles. Act of Oct. 24, 1962, 76 Stat. 1246. There is no discussion in the legislative history of that amendment about the intended effect of the amendment on reservation Indian hunting rights. Only one mention of Indians was incorporated into the congressional debates on the 1962 amendment: a letter from the Assistant Secretary of the Interior, dated February 5, 1962, discusses the veneration of eagles by Indians. 108 Cong.Rec. 22272 (1962). Contemporaneous with the recommendation to Congress, however, the Department of the Interior, espoused the position that:

> [A] treaty Indian is not subject to the Migratory Bird Treaty Act while on his own Indian reservation. The same is true, by analogy, of the Bald Eagle Act. While they remain on their reserved land, your Bureau is without authority to prevent Indians from taking and possessing protected migratory birds.

Memorandum from the Office of the Solicitor, U. S. Department of the Interior, Washington, D. C., to the Director of the Bureau of Sport Fisheries and Wildlife, dated April 26, 1962.

The exception in 16 U.S.C. § 668a (incorporated in the statute in 1962), is not limited to the taking of eagles by Indians or to the taking of eagles on Indian reservations. The exception relied upon by the government to show an intent by Congress to include Indians hunting on reservations within the purview of 16 U.S.C. § 668 is that part allowing the Secretary of Interior to permit the taking of eagles "for the religious purposes of Indian tribes, . . . ." Theoretically non-Indians could be thus permitted by the Secretary to take the eagles, on or off a reservation, as long as it was for the "religious purposes of Indian tribes." It is difficult to understand, then, how this exception could be interpreted to show an express intent of Congress to abrogate treaty rights of Indians to hunt on their own reservation.

The congressional silence in the enactment of the amendment and the position of the Department of the Interior confirm that Congress did not intend 16 U.S.C. § 668 or 16 U.S.C. § 668a "as a backhanded way of abrogating the hunting . . . rights of these Indians."

Menominee Tribe of Indians v. United States, *supra*, 391 U.S. at 412, 88 S.Ct. at 1711. This conclusion accords with the result reached in United States v. Cutler, 37 F.Supp. 724 (D.Idaho 1941) where the district court held that a treaty Indian was not subject to the Migratory Bird Treaty Act while on his reservation. While we do not question that Congress has the authority to modify reservation hunting rights, Lone Wolf v. Hitchcock, *supra*, we do not believe that the language or history of 16 U.S.C. § 668 accomplishes that purpose here. It must be remembered that 16 U.S.C. § 668(a) is a penal statute, that Jackie White was charged with its violation and by his trial was exposed to possible fine and loss of liberty. The specificity which we require of our criminal statutes is wholly lacking here as applied to an Indian on an Indian reservation.

For the reasons hereinbefore set forth, we affirm the decision of the district court.

LAY, Circuit Judge (dissenting).

I respectfully dissent.

Under our Constitution, a treaty has the same status as an Act of Congress and that body may, by the enactment of a subsequent law, abrogate or modify a prior treaty. Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903); Head Money Cases, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 780 (1884). A later statute must be harmonized with existing treaties to the extent possible and "the intention to abrogate or modify a treaty is not to be lightly imputed to Congress," Menominee Tribe v. United States, 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968), but this does not mean that intention may be ignored when it is apparent from both the subject matter and wording of the statute. Thomas v. Gay, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898); The Cherokee Tobacco, 78 U.S. (11 Wall.) 616, 20 L.Ed. 227 (1870). The absence of express

words of abrogation is not decisive. It has long been the rule that a subsequent inconsistent law which cannot be reconciled with a prior treaty is deemed to abrogate the treaty to the extent of the inconsistency *without specific words of abrogation*.[1] See Reid v. Covert, 354 U.S. 1, 18, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); Whitney v. Robertson, 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386 (1888); The Head Money Cases, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 780 (1884); The Cherokee Tobacco, 78 U.S. (11 Wall.) 616, 20 L.Ed. 227 (1878); Navajo Tribe v. NLRB, 109 U.S.App.D.C. 378, 288 F.2d 162 (1961); Seneca Nation of Indians v. Brucker, 104 U.S.App.D.C. 315, 262 F.2d 27 (1958); Ex parte Green, 123 F.2d 862 (2d Cir. 1941).

In Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), the principle case on which the majority relies, the question was whether the Termination Act, 25 U.S.C. §§ 891–902, abrogated the hunting and fishing rights traditionally enjoyed by the Menominee Tribe in Wisconsin. In deciding that it did not, the court did not rely solely on the absence of specific reference to hunting and fishing rights in the legislative history. Rather, it focused on the wording of the act and its stated purpose. It found the act was only intended to "provide for the 'orderly termination of Federal supervision over the property and members'" of the tribe and that it contained absolutely no mention of hunting or fishing rights. It was on the basis of all three factors, legislative history, statutory wording and stated purpose, that the court concluded there was no intention to abrogate the Menominees' treaty rights.

The majority here, however, limits their analysis of § 668 to the fact that there is no express reference, either within § 668 or its legislative history, to modification of the defendant's treaty right to hunt eagles. Overlooked is the broad wording and the pervasive purpose which the act is intended to fulfill—the protection of the bald and golden eagles.

---

1. The holding in United States v. Cutler, 37 F.Supp. 724 (D.Idaho 1941), to the effect that treaty provisions can preclude amendment by an Act of Congress is clearly in error. *See* Anderson v. Gladden, 293 F.2d 463 (9th Cir. 1961).

Both the House and the Senate Report explained the *purpose* of the original § 668 by quoting from a letter from the Acting Secretary of Agriculture, dated March 3, 1939, which reads:

It is apparent to this Department from its long observations with respect to the wildlife of this country that there are those in any community in which an eagle may appear who are immediately seized with a determination to kill it for no other reason than that it is an eagle and a bird of large proportions. It is equally apparent that if the destruction of the eagle and its eggs continues as in the past this bird will wholly disappear from much the larger part of its former range and eventually will become extinct.

From an esthetic point of view there can be no question as to the desirability of protecting the eagle. Its status as the emblem of the sovereignty of the United States settles that; the bird should be a ward of the National Government. Real lovers of nature, of which there are millions in this country now, count it a red-letter day when they see an eagle, and they are united in support of legislation such as is proposed in this bill. They would regret beyond expression to see the now evident process of extinction of this bird continue and fervently hope that it can be checked for all time by the Congress of the United States.[2]

H.R.Rep.No.2104, 76th Cong., 3d Sess. 1 (1940).

In 1962 the statute was amended to extend the same protection to the golden eagle and to allow the taking of birds of either species "for the religious purposes of Indian tribes" upon compliance with specified procedures.[3]

The joint resolution of Congress, affixed as a preamble to that amendment, is significant. It reads:

Joint Resolution to provide protection for the golden eagle.

WHEREAS the population of the golden eagle has declined at such an alarming rate that it is now threatened with extinction; and

WHEREAS the golden eagle should be preserved because of its value to agriculture in the control of rodents; and

WHEREAS protection of the golden eagle will afford greater protection for the bald eagle, the national symbol of the United States of America, because the bald eagle is often killed by persons mistaking it for the golden eagle: Now, therefore, be it

. . .

1962 U.S.Code Cong. & Admin.News, p. 1453.

In 1972 Congress, again aroused by the useless destruction and possible extinction of these great birds, amended the act to increase the penalty against and

**2.** The preamble to the original act stated:

Whereas the Continental Congress in 1782 adopted the bald eagle as the national symbol; and

Whereas the bald eagle thus became the symbolic representation of a new nation under a new government in a new world; and

Whereas by that Act of Congress and by tradition and custom during the life of this Nation, the bald eagle is no longer a mere bird of biological interest but a symbol of the American ideals of freedom; and

Whereas the bald eagle is now threatened with extinction: Therefore

Be it enacted * * *, etc.

June 8, 1940, c. 278, § 1, 54 Stat. 250.

**3.** The terms of the 1962 amendment exempting eagles taken for religious purposes of Indians cannot of course be used to change the original meaning of § 668. The amendment is, nevertheless, at least under the majority's approach, relevant to our consideration. Assuming the original statute is ambiguous, as the majority maintains (a premise upon which we are in disagreement), a subsequent amendment can be useful in resolving ambiguity in statutory construction. *See* State Highway Commission v. Volpe, 479 F.2d 1099, 1116 (8th Cir. 1973); 2 A. Sutherland, Statutory Construction § 482(d) (3d ed. 1945). Thus, the recognition by Congress in 1962 that Indians should be permitted to take eagles for religious purposes is strong indication that Congress originally meant what it said and that the term "whoever" included all persons who take the eagle from its natural habitat, whether by treaty rights or otherwise.

to lessen the degree of knowledge required to convict violators. Again, the purpose of the enactment can be found in a letter from one of its many proponents. After the act passed the House of Representatives, Nathanial P. Reed, Assistant Secretary of the Interior, wrote Senator Magnuson, Chairman of the Committee on Commerce:

> There exist but 10–20,000 golden eagles in North America, and 20–30,000 northern bald eagles. The prompt enactment of H.R. 12186 will help to protect these majestic birds, aptly described by the Congress in 1940 as "a symbol of the American ideals of freedom."

1972 U.S.Code Cong. & Admin.News, pp. 4292–4293.

The 1972 amendment also provided for the forfeiture of vehicles, planes, etc., used in violating the act, and incorporated the specific language of Section 5 of the Migratory Bird Treaty Act, as amended, previously incorporated only by reference, which allows an employee of the Department of the Interior to enforce the provisions of the act by arresting "any person" violating the act.

In view of the continuing concern over the possible extinction of these species of eagles manifested by Congress, both in the original Act and its several amendments, it is unrealistic to urge now that Congress did not intend, within the all-encompassing words of prohibition, to include Indians such as the defendant who enjoy a general treaty right to hunt on their reservations. It is difficult to understand how the language Congress used could be given limited application. It is difficult to perceive how Congress could be more explicit when the prohibitions now extend to "*whoever,* within the United States or any place subject to its jurisdiction . . . ." These words are hardly ambiguous or equivocal. Viewing the avowed purpose of the legislation, they leave no room for construction or interpretation.[4] *Cf.* United States v. Laudani, 320 U.S. 543, 64 S.Ct. 315, 88 L.Ed. 300 (1944) ("whoever" defined in terms of the purpose of the Kickback Act).

Unlike revenue laws (*cf.* Squire v. Capoeman, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956)) which generally contain numerous exceptions premised upon the varying goals of the legislatures which passed them, a conservation statute will achieve its purpose only if it applies to everyone. The Supreme Court recognized this fact in discussing a state's regulation of off-reservation fishing rights of Indians acquired under a treaty in Kennedy v. Becker, 241 U.S. 556, 36 S.Ct. 705, 60 L.Ed. 1166 (1916):

> It is said that the state would regulate the whites and that the Indian tribe would regulate its members, but if neither could exercise authority with respect to the other at the *locus in quo,* either would be free to destroy the subject of the power. Such a duality of sovereignty, instead of maintaining in each the essential power of preservation would in fact deny it to both.

*Id.* at 563, 36 S.Ct. at 707.

---

4. While it may once have been the law that general statutes did not apply to Indians, it is now well recognized that general laws, which by their terms apply to all, apply to Indians, at least in their property interests. Federal Power Commission v. Tuscarora Indian Nation, 362 U.S. 99, 115–116, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960). Fishing and hunting rights are property rights. Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). Thus, the wording of the statute strongly indicates a congressional intent that it apply to everyone. *Cf.* Head v. Hunter, 141 F.2d 449 (10th Cir. 1944).

   * * * There is nothing in the legislation to indicate, or from which it can be inferred that the jurisdiction of the United States was restricted in respect to crimes which are generally applicable throughout the United States to all persons. We are cited to no Act, and find none, indicating an intention to except this appellant or his tribe from the scope of the Act creating and defining the offense. Appellant is charged with an offense against the laws of the United States which is generally applicable to all persons wherever committed . . . .

*Id.* at 451.

And see more recently our approval of this language in Stone v. United States, 506 F.2d 561 (8th Cir. 1974).

*See also* Puyallup Tribe v. Department of Game, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968); Tulee v. Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942).

Congress obviously recognized the dire need for legislation and realized that conservation can be accomplished only by the enactment of a law which applies to *all* persons, prior treaties notwithstanding. I would reverse the district court's dismissal and remand the case for trial.