James SLATER, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

No. 75-1241.

United States Court of Appeals,
First Circuit.

Argued Sept. 14, 1976.

Decided Dec. 22, 1976.

Robert K. Lamere, Boston, Mass., by appointment of the Court, with whom Sullivan & Worcester, Boston, Mass., was on brief, for appellant.

Charles E. Chase, Asst. U.S. Atty., Boston, Mass., with whom James N. Gabriel, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CLARK *, Associate Justice, U.S. Supreme Court (Ret.), and CAMPBELL, Circuit Judge.

COFFIN, Chief Judge.

The appellant was convicted on two counts. The first count charged him with conspiring to defraud the United States, 18 U.S.C. § 371, and the second with violating the Kickback Act, 18 U.S.C. § 874. On appeal, he makes two arguments: that the Kickback Act cannot be applied to the facts of his case, and that the two statutes are so inherently contradictory that he cannot be convicted of violating both. He does not otherwise challenge his conviction under § 371. We do not find the statutes contradictory, but we agree that the Kickback Act does not apply to this case.

In 1969, the City of Boston entered into a contract with the federal government. The city agreed to set up and administer a Model Cities program, which would, among other things, make grants to low income homeowners who wished to repair their dwellings. The federal government agreed to pay for all of the grants and four-fifths of the administration costs. *See* 42 U.S.C.

---

* Sitting by designation.

§ 3301 *et seq.* The appellant helped to administer the program by inspecting the work of contractors hired to carry out repairs. If he was not satisfied with a contractor's work, he could stop future "progress payments" for the work he was inspecting and make it difficult for the contractor to get other jobs under the program. In August of 1971, appellant took a contractor whose work he was supervising to a home in need of rehabilitation. The Model Cities administration had already agreed to pay $5,000 for the work that needed to be done. Appellant asked the contractor whether he could do the work for $4500 and give the remaining $500 to appellant. The contractor said he could and he was awarded the job. The contractor paid appellant $300 when the first progress payment was made.

■ Appellant's first argument is that this payment did not violate the Kickback Act. The act, using extraordinarily broad language, makes a criminal of

"[w]hoever, by force, intimidation, or threat of procuring dismissal from employment, or by any other manner whatsoever induces any person employed in the construction, prosecution, completion or repair of any public building, public work, or building or work financed in whole or in part by loans or grants from the United States, to give up any part of the compensation to which he is entitled under his contract of employment . . ." 18 U.S.C. § 874.

Appellant argues that an independent contractor is not "employed" and does not have a "contract of employment" within the meaning of this statute. Although he failed to make this argument below, he did move for a judgment of acquittal at the close of the government's case and at the close of all the evidence. This put the sufficiency of the evidence in issue and preserved that question for appeal. *See United States v. Jones,* 174 F.2d 746 (7th

Cir. 1949); *United States v. Perplies,* 165 F.2d 874 (7th Cir. 1948); *see also United States v. Leach,* 427 F.2d 1107, 1111 (1st Cir.), *cert. denied sub nom. Tremont v. United States,* 400 U.S. 829, 91 S.Ct. 57, 27 L.Ed.2d 59 (1970).[1]

■ The language of § 874 hardly provides a crystal clear answer to the question raised by appellant's argument. A "contract of employment" most accurately describes contracts exchanging services for wages; but appellant's victim had agreed to supply materials and the labor of others, as well as his own services. Moreover, in applying the statute, we must bear in mind the canon that criminal defendants are entitled to a reasonably strict construction of the law they are accused of breaking. *United States v. Fruit Growers Express Co.,* 279 U.S. 363, 369, 49 S.Ct. 374, 73 L.Ed. 739 (1929). The very breadth of the statutory language gives us pause as well. It applies to "whoever" induces "[by] intimidation . . . or by any other manner whatsoever" an employee on a federally subsidized project to pay over part of his wages. Read literally, the statute would punish a construction worker's wife if she induced her husband to hand over his pay check. It would make every petty blackmail scheme a federal crime if the victim happened to work on a federally subsidized building project. The federal courts have uniformly rejected a literal reading of the statute. *See United States v. Carbone,* 327 U.S. 633, 637, 66 S.Ct. 734, 90 L.Ed. 904 (1946); *United States v. Laudani,* 320 U.S. 543, 544–46, 64 S.Ct. 315, 88 L.Ed. 300 (1944); *United States v. Price,* 224 F.2d 604, 607 (6th Cir. 1955) (Stewart, J.), *cert. denied,* 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955). The Supreme Court has pointed out that "not every person or act falling within the literal sweep of the language of the Kickback Act necessarily comes within its intent and purpose. That language must be read and applied in light of the evils which gave rise to the statute and the aims which the pro-

1. A more specific motion was not needed, 2 Wright & Miller Federal Practice and Procedure § 466. Moreover, we conclude that the government failed to prove an element of the statutory offense, a defect that is frequently treated as plain error. *See Strickland v. United States,* 339 F.2d 866 (10th Cir. 1965).

ponents sought to achieve." *United States v. Carbone, supra*, 327 U.S. at 637, 66 S.Ct. at 736.

These considerations suggest to us that independent contractors are not protected by § 874; but the suggestion is not free from ambiguity. In these circumstances we must look behind the statutory language for other indications of Congress's intent. We do this, not to modify the plain meaning of § 874, but to confirm and refine a conclusion derived from reading the statute itself. Our decision to seek external evidence of congressional purpose is buttressed by the consistency and clarity of this evidence. The Kickback Act was passed on June 13, 1934.[2] It was styled "An Act to effectuate the purpose of certain statutes concerning rates of pay for labor, by making it unlawful to prevent anyone from receiving the compensation contracted for thereunder, and for other purposes." 48 Stat. 948. The committee reports elaborate on this theme. "It has been a common practice for contractors constructing Federal buildings to pay the employees the prevailing rate as determined by the Secretary of Labor and then have them return a certain amount to the contractor. That is a most vicious practice." S.Rep. No. 803, 73d Cong., 2d Sess. (1934) (adopting the language of a labor leader). "This bill is aimed at the suppression of the so-called 'kick-back racket' by which a contractor on a Government project pays his laborers wages at the rate the Government requires him to pay them, but thereafter forces them to give back to him a part of the wages they have received." H.Rep. No. 1750, 73d Cong., 2d Sess. (1934).

The government wage standards to which these materials refer stemmed primarily from the Davis-Bacon Act, 40 U.S.C. § 276a, which was passed in 1931 to regulate wages on government construction projects. In essence the act requires that workers on government projects be paid the prevailing wage for similar work in the area. The theory of Davis-Bacon and its many progeny[3] is that the federal government ought not to be a party to the lowering of wages in communities where private sector jobs are scarce. This could easily happen where the government is the only source of work.[4] By mandating the payment of locally prevailing wages, the act ensures that the market power of the federal government will not be exerted against the worker, but will rather create a wage floor which other employers must meet to obtain labor. Section 874 is closely allied with the Davis-Bacon Act.[5] The act's intention would be quite negated if a private contractor on a federal project could take advantage of a weak

---

2. The act was modified slightly when the criminal code was revised in 1948. As originally passed, it read:

   "*Be it enacted by the Senate and House of Representatives of the United States of America in Congress Assembled,* That whoever shall induce any person employed in the construction, prosecution, or completion of any public building, public work, or building or work financed in whole or in part by loans or grants from the United States, or in the repair thereof to give up any part of the compensation to which he is entitled under his contract of employment, by force, intimidation, threat of procuring dismissal from such employment, or by any other manner whatsoever, shall be fined not more than $5,000, or imprisoned not more than five years, or both.

   "Sec. 2. To aid in the enforcement of the above section, the Secretary of the Treasury and the Secretary of the Interior jointly shall make reasonable regulations for contractors or subcontractors on any such building or work, including a provision that each con-

tractor and subcontractor shall furnish weekly a sworn affidavit with respect to the wages paid each employee during the preceding week." 48 Stat. 948.

3. For a list of 62 statutes following Davis-Bacon and conferring on the Secretary of Labor a power to set wage rates for federally subsidized projects, consult 29 C.F.R. Part 1, App. I (1975).

4. Although the theory had more appeal in the Great Depression, it has continued relevance today in areas suffering from local unemployment or where expansion of the public sector has made the federal government a dominant employer.

5. How closely can be seen by noting that when § 874 was first enacted, it had two sections, *see* note 1, *supra*; the second is now revised and codified at 40 U.S.C. § 276c, part of the enforcement procedures for the Davis-Bacon Act, § 276a.

labor market to demand kickbacks as the price of continued employment. The Congress's intention to prevent such a borrowing of government market power acts as a limit on the otherwise unrestrained language of § 874. Thus the section has been applied to anyone in a position to take advantage of a weak local job market by "selling" jobs on federal construction sites. *See United States v. Laudani, supra,* 320 U.S. 543, 64 S.Ct. 315, 88 L.Ed. 300 (section applies to foremen with power to discharge workers); *see also United States v. Price, supra,* 224 F.2d 604. It does not, however, apply to lawful union efforts to collect dues, *United States v. Carbone, supra,* 327 U.S. 633, 66 S.Ct. 734, 90 L.Ed. 904, although union officials who abuse their economic power by extorting payments from workers may be charged under § 874. *United States v. Alsup,* 219 F.2d 72 (5th Cir.), *cert. denied,* 348 U.S. 982, 75 S.Ct. 572, 99 L.Ed. 764 (1955).

■ Later legislative references to § 874 add weight to our narrow view of that section. 42 U.S.C. § 1459 says "*In order to protect labor standards* —. . . the provisions of [section 874] . . . shall apply to work financed in whole or in part with funds made available . . . pursuant to this [urban renewal] title." [Emphasis added.] And the Housing Act of 1937 took a similarly limited view of § 874: "*In order to protect labor standards* —. . . [t]he provisions of [section 874] . . . shall apply to contracts in connection with the development or administration of Federal projects, and the furnishing of materials and labor for such projects". 50 Stat. 894, 896–97.[6] [Emphasis added.] These references confirm our view that § 874, despite its sweeping language, merely serves to enforce federal wage standards in federally subsidized projects.

With this principle in mind, we return to appellant. The transaction out of which this prosecution grew was based on the federal rehabilitation grant program. Al-

though administered through the relatively new Model Cities device, the authority for these grants was an older statute, 42 U.S.C. § 1466. Grants under this section are subject to 42 U.S.C. § 1459, which requires that certain employees be paid the locally prevailing wage or salary. However, § 1459 only protects the wages of "architects, technical engineers, draftsmen, and technicians employed in the development of the project involved and . . . all laborers and mechanics . . . " 42 U.S.C. § 3310, which applies to Model Cities rehabilitation programs, protects only "laborers and mechanics". By no stretch of the imagination can an independent contractor, himself an employer, be seen as an object of the Congress's concern in these provisions.

By so holding, we do not leave the federal government helpless in the face of conduct such as appellant's. Although it is doubtful that the federal laws against bribery and extortion, 18 U.S.C. §§ 201 & 872, can be applied to Model Cities employees, *see United States v. Del Toro,* 513 F.2d 656 (2d Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975), appellant's acts seem to fall squarely within the scope of 41 U.S.C. §§ 51–54, the "Anti-Kickback Act". Among other things, this act imposes civil and criminal penalties on the employees of government contractors if the employees accept payments from subcontractors who seek to influence or acknowledge the award of a subcontract. The City of Boston appears to hold a negotiated contract with the federal government, the contractor seems to meet the act's definition of subcontractors, and appellant was undoubtedly employed by the city. *See generally Howard v. United States,* 345 F.2d 126 (1st Cir.), *cert. denied,* 382 U.S. 838, 86 S.Ct. 86, 15 L.Ed.2d 80 (1965); *Travers v. United States,* 361 F.2d 753 (1st Cir.), *cert. denied,* 385 U.S. 834, 87 S.Ct. 76, 17 L.Ed.2d 68 (1966); *Annotation,* 19 A.L.R.F. 545.

■ With the elimination of this count, appellant's second claim, that he was

---

6. This language was retained until 1974, when the nation's housing laws were extensively revised. *Cf.* 42 U.S.C. § 1437j.

charged with legally inconsistent crimes, stands on softer ground. Any inconsistency would seem to have been cured by striking the Kickback Act conviction. Appellant, however, cites *Milanovich v. United States*, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961), in which the Supreme Court required a new trial for a defendant convicted on inconsistent counts. The Court said that "there is no way of knowing whether a properly instructed jury would have found the [defendant] guilty of larceny or of receiving (or, conceivably, of neither)." *Id.* at 555, 81 S.Ct. at 730. We have some doubt about *Milanovich's* relevance to this situation, but there is no need to resolve the question, for we find that the two counts are not inconsistent. The Kickback Act applies to inducements by "force, intimidation, or threat of procuring dismissal from employment, or by any other manner whatsoever". Even without expanding the last clause beyond reason, we can imagine inducements falling within the Kickback Act which would not negate the agreement that is a necessary element of every conspiracy. Indeed, the present case supplies a ready example. Appellant induced the contractor to pay by impliedly threatening to harass the contractor on his present job and to withhold future contracts. This kind of economic threat was not enough to overbear the contractor's will and make his participation in the conspiracy involuntary. If appellant had secured the contractor's agreement by threatening to kill him, a conspiracy between the two might be less plausible, but that is not this case. *Cf. United States v. Saglietto*, 41 F.Supp. 21, 33 (E.D.Va.1941) ("compelling fear of personal harm negatives the very requisites of conspiracy").

Only one sentence was imposed for the two offenses. The sentence that was given may or may not, in the district court's discretion, remain appropriate, but we do not know to what extent the judge was affected by the invalid conviction. Therefore, we have no choice but to vacate and remand for resentencing under the remaining conviction for conspiracy.

*The sentence is vacated; we remand for proceedings consistent with this opinion.*