752 F.2d 1261
 15 Envtl. L. Rep. 20,093
 UNITED STATES of America, Appellant,
v.
Dwight DION, Sr., Appellee.
UNITED STATES of America, Appellee,
v.
Asa PRIMEAUX, Sr., Appellant.
UNITED STATES of America, Appellee,
v.
Dwight DION, Sr., Appellant.
UNITED STATES of America, Appellee,
v.
Lyle DION, Appellant.
UNITED STATES of America, Appellee,
v.
Terry Fool BULL, Appellant.
 Nos. 83-2353, 83-2521, 83-2538, 83-2543 and 83-2544.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 13, 1984.
Decided Jan. 9, 1985.
 
 James Kilbourne (argued), Claire L. McGuire, Justice Dept., Washington, D.C., and Bonnie P. Ulrich, Asst. U.S. Atty., Sioux Falls, S.D., for the U.S.
 Michael Dow, William Kenyon and Richard Johnson (all argued), John N. Gridley, II, Sioux Falls, S.D., for defendants.
 Before HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, and BOWMAN, Circuit Judges, en banc.*
 ROSS, Circuit Judge.
 
 
 1
 From February 25, 1981, to June 15, 1983, agents for the United States Fish and Wildlife Service conducted an undercover operation ("Operation Eagle") in South Dakota to investigate the killing and selling of bald and golden eagles and other protected birds. Posing as traders and collectors, the agents purchased the carcasses and parts of such birds from a number of tribal Indians, including the defendants in this appeal. The defendants were subsequently charged, in separate indictments, with taking and selling bald and golden eagles and other protected birds in violation of the Eagle Protection Act, 16 U.S.C. Secs. 668-668d (1982), the Migratory Bird Treaty Act, 16 U.S.C. Secs. 703-711 (1982), and the Endangered Species Act, 16 U.S.C. Secs. 1531-1543 (1982).
 
 
 2
 Relying upon this court's decision in United States v. White, 508 F.2d 453 (8th Cir.1974), the district court[1] dismissed count 12 of the indictment against Dwight Dion, Sr., which charged him with taking[2] an eagle in violation of the Eagle Protection Act, since the taking occurred on the Yankton Sioux Reservation. The court refused, however, to grant motions to dismiss the remaining charges against Dwight Dion, Sr., or the charges against Lyle Dion.
 
 
 3
 A jury then convicted defendant Dwight Dion, Sr., of violating 16 U.S.C. Sec. 668(a) (1982) of the Eagle Protection Act by offering for sale or selling parts of bald eagles (in the form of fans) (counts 3 and 5), violating 16 U.S.C. Secs. 703 and 707 (1982) of the Migratory Bird Treaty Act by offering for sale or selling feathers of scissor-tailed flycatchers (in the form of fans) (counts 9, 11, and 14), selling seven bald eagle carcasses, and one golden eagle carcass (count 13), and violating 16 U.S.C. Secs. 1538(a)(1)(B) and 1540(b)(1) (1982) of the Endangered Species Act by taking[3] four bald eagles (counts 8 and 10). Defendant Lyle Dion was convicted of violating 16 U.S.C. Secs. 1538(a)(1)(B) and 1540(b)(1) (1982) of the Endangered Species Act by taking a bald eagle (count 1) and violating 16 U.S.C. Secs. 703 and 707 (1982) of the Migratory Bird Treaty Act by offering for sale or selling a bald eagle (count 2).
 
 
 4
 The government appeals the dismissal of count 12 of the indictment against Dwight Dion, Sr., pursuant to the provisions of 18 U.S.C. Sec. 3731 (1982), arguing that White should be overruled. Two of the defendants on this appeal,[4] Dwight Dion, Sr., and Lyle Dion (father and son), argue that White should be extended to shield them from criminal liability for all the charges against them.[5]
 
 
 5
 We shall continue to adhere to the narrow holding of White and we extend its reasoning to the Endangered Species Act. At the same time, however, we limit its reach, under the facts of this case, to noncommercial transactions.
 
 I. White Holding
 
 6
 In White, this court concluded that:[T]he Red Lake Band of Chippewa Indians enjoy a right to hunt on the Red Lake Reservation and * * * this right has been implicitly recognized in treaties negotiated by that band and the United States. To affect those rights, then, by 16 U.S.C. Sec. 668 [the Eagle Protection Act], it was incumbent upon Congress to expressly abrogate or modify the spirit of the relationship between the United States and Red Lake Chippewa Indians on their native reservation. We do not believe it has done so.
 
 
 7
 United States v. White, supra, 508 F.2d at 457-58. Accordingly, we held that an enrolled member of the Red Lake Band of Chippewa Indians who shot at a bald eagle within the confines of the Red Lake Reservation could not be convicted of taking an eagle in violation of the Eagle Protection Act.
 
 
 8
 In applying the treaty defense established in White, it must first be determined whether the defendants were acting within the scope of a treaty right. If so, it must then be determined whether the treaty right has been abrogated.
 
 II. Treaty Rights
 
 9
 In 1858, the Yankton Sioux and the United States negotiated a treaty[6] in which the Yankton Sioux ceded and relinquished to the United States all lands claimed by the tribe except for a four hundred thousand acre tract of land.[7] This land was reserved for their occupation and is now known as the Yankton Sioux Reservation.
 
 
 10
 Defendants Dwight Dion, Sr., and Lyle Dion are enrolled members of the Yankton Sioux Tribe. They assert that all of the criminal acts alleged in their indictments were committed on the Yankton Sioux Reservation and that, pursuant to the decision in White, they possessed a treaty right to hunt and sell the birds free from threat of criminal liability.
 
 A. Principles of Construction
 
 11
 Distinctive principles of construction have been developed for the purpose of interpreting the scope of Indian treaties, partially due to the United States' "superior negotiating skills and superior knowledge of the language in which * * * [treaties were] recorded, * * *." Washington v. Washington State Commercial Passenger Fishing Vessel Association, 443 U.S. 658, 675-76, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979). See F. Cohen, Handbook of Federal Indian Law 222 (1982 ed.) (hereinafter cited as Cohen). These principles have been summarized as follows: "In construing Indian treaties, the courts have required that treaties be liberally construed to favor Indians, that ambiguous expressions in treaties must be resolved in favor of the Indians, and that treaties should be construed as the Indians would have understood them." Cohen, supra, at 222 (citations omitted). The Ninth Circuit developed the latter principle in United States v. Top Sky, 547 F.2d 486 (9th Cir.1976) as follows:
 
 
 12
 The treaty is to be construed as the Indians would have understood it, Choctaw Nation v. Oklahoma, 397 U.S. 620, 631 [90 S.Ct. 1328, 1334, 25 L.Ed.2d 615] (1970); United States v. Shoshone Tribe, 304 U.S. 111, 116 [58 S.Ct. 794, 797, 82 L.Ed. 1213] (1938), as disclosed by the practices and customs of the Indians at the time the treaty was negotiated, Kimball v. Callahan, 493 F.2d 564, 566 (9th Cir.1974); Moore v. United States, 157 F.2d 760, 762-63 (9th Cir.1946), and by the history of the treaty, the negotiations that preceded it, and the practical construction given the treaty by the parties, Skokomish Indian Tribe v. France, 320 F.2d 205, 207-08 (9th Cir.1963), quoting Choctaw Nation v. United States, 318 U.S. 423, 431-32 [63 S.Ct. 672, 677-78, 87 L.Ed. 877] (1943). In sum, the treaty is to be interpreted to attain the reasonable expectations of the Indians. Wilkinson & Volkman, Judicial Review of Indian Treaty Abrogation, 63 Calif.L.Rev. 601, 617-18 (1975).
 
 
 13
 Id. at 487.
 
 B. Right to Hunt
 
 14
 Although the Yankton Sioux treaty is silent as to on-reservation hunting rights, the following statement in White makes it clear that such rights exist:
 
 
 15
 "An examination of the various treaties between the United States and the Chippewa Indians discloses that while the right in the Indians to hunt and fish on ceded lands was reserved in some of the earlier treaties[8] * * *, no reservation of the right to hunt and fish was made with respect to the unceded lands of the Red Lake Reservation. But such a reservation was not necessary to preserve the right on the lands reserved or retained in Indian ownership. The right to hunt and fish was part of the larger rights possessed by the Indians in the lands used and occupied by them. Such right, which was 'not much less necessary to the existence of the Indians than the atmosphere they breathed' remained in them unless granted away." United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905).
 
 
 16
 United States v. White, supra, 508 F.2d at 457 (emphasis added) (quoting F. Cohen, Handbook of Federal Indian Law 496-97 (2d ed. 1958)). White clearly establishes that the Yankton Sioux Indians would have understood the treaty as reserving in them the right to hunt eagles on their reservation, at least for traditional purposes.[9]
 
 C. Right to Sell
 
 17
 In United States v. Top Sky, supra, 547 F.2d 486, the Ninth Circuit upheld an Indian's conviction for selling eagle feathers on the ground that his treaty rights as a Chippewa-Cree Indian did not extend to the commercial sale of eagles. No expectation of a treaty right to sell eagles existed, since there was no historical evidence of a practice of selling eagle parts and since such a practice was deplored as a matter of tribal custom and religion. Id. at 487-88.
 
 
 18
 The defendants in this appeal presented no historical evidence of a Yankton Sioux practice of selling parts or carcasses of eagles or scissor-tailed flycatchers. In fact, like Top Sky, the record discloses that the sale of eagle parts is deplored as a matter of tribal custom and religion. We find that the Yankton Sioux would not have understood the treaty as reserving in them a right to sell eagles or scissor-tailed flycatchers. Accordingly, the defendants do not have a treaty right to sell such birds.[10]
 
 D. Right to Engage in Commercial Taking
 
 19
 Since the Yankton Sioux lacked any understanding that they had a treaty right to sell eagles commercially, it follows that they could not have had a reasonable expectation of a right to take eagles for this purpose. We find that the Yankton Sioux would not have understood the treaty as reserving in them a right to take eagles for the purpose of a commercial transaction.[11]
 
 
 20
 The trial court failed to make a finding, upon the motions to dismiss filed by Dwight and Lyle Dion, that the takings were committed for such a purpose. Nor did the court instruct the jury to make such a finding. Instead, the district court refused to dismiss counts 8 and 10 of the indictment against Dwight Dion, Sr., and count 1 of the indictment against Lyle Dion solely on the basis that the Endangered Species Act abrogated the defendants' treaty hunting rights.
 
 
 21
 Accordingly, it must next be determined whether Congress has, in fact, abrogated or modified the defendants' treaty right to hunt in the Endangered Species Act. We must make a similar determination regarding the Eagle Protection Act, since the district court concluded that Dwight Dion, Sr., had established a treaty defense to count 12 of the indictment against him. We need not, however, determine whether Congress has abrogated or modified Indian treaty rights to hunt in the Migratory Bird Treaty Act. The defendants were charged only with selling or offering to sell eagles and scissor-tailed flycatchers in violation of the Migratory Bird Treaty Act. No unlawful taking in violation of this Act was charged. Since we have found that the Dions lacked a treaty right to sell eagles or scissor-tailed flycatchers, the district court's refusal to grant the defendants' motions to dismiss based on their treaty defense was proper as to the Migratory Bird Treaty Act counts.
 
 III. Statutory Abrogation of Treaty Rights
 
 22
 It is undisputed that Congress can abrogate treaty rights. See Lone Wolf v. Hitchcock, 187 U.S. 553, 566, 23 S.Ct. 216, 221, 47 L.Ed. 299 (1903). The test for determining whether Congress has effectively abrogated treaty rights, however, has been disputed. See Wilkinson and Volkman, Judicial Review of Indian Treaty Abrogation, 63 Calif.L.Rev. 601, 623-45 (1975) (judicial tests include: 1) abrogation only upon a "clear showing" of legislative intent, 2) abrogation "not lightly imputed," 3) abrogation only after "liberal construction" of the statute in favor of Indian treaty rights, 4) abrogation only upon express legislative reference to Indian treaty rights, and 5) several miscellaneous tests).
 
 A. White Test
 
 23
 In White, we determined that statutory abrogation of treaty rights can only be accomplished by an express reference to treaty rights in the statute or in the statute's legislative history. We relied primarily upon Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), wherein the Supreme Court held that a statute terminating the federal trust relationship with the Menominee Tribe did not abrogate or modify treaty rights to hunt and fish. The Court "decline[d] to construe the Termination Act as a backhanded way of abrogating" the treaty rights, since an intention to abrogate the treaty rights would not be "lightly imputed to the Congress." Id. at 412-13, 88 S.Ct. at 1710-11. The Court emphasized that the Termination Act contained no "explicit statement" abrogating hunting and fishing rights. Id. at 413, 88 S.Ct. at 1711.
 
 
 24
 This emphasis on express language was reaffirmed by the Court in Washington v. Washington State Commercial Passenger Fishing Vessel Association, supra, 443 U.S. 658, 99 S.Ct. 3055. The Court stated: "[a]bsent explicit statutory language, we have been extremely reluctant to find congressional abrogation of treaty rights, * * *." Id. at 690, 99 S.Ct. at 3076 (citing Menominee Tribe v. United States, supra ).
 
 
 25
 We also relied upon the fact that, in the final analysis, the issue was whether the Indian defendant would be subject to criminal sanctions. We stated:
 
 
 26
 It must be remembered that 16 U.S.C. Sec. 668(a) is a penal statute, that Jackie White was charged with its violation and by his trial was exposed to possible fine and loss of liberty. The specificity which we require of our criminal statutes is wholly lacking here as applied to an Indian on an Indian reservation.
 
 
 27
 United States v. White, supra, 508 F.2d at 459. See also United States v. Bass, 404 U.S. 336, 347-48, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) ("Congress * * * [must speak] in language that is clear and definite" before a criminal sanction is imposed) (quoting United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221-22, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952)).
 
 B. Viability of White Test
 
 28
 The government argues that the express reference test established in White should be overruled. It argues that: 1) surrounding circumstances and legislative history should be considered, and 2) where necessary in the interest of conversation, a federal statute may regulate treaty hunting and fishing rights, without expressly abrogating such rights, as long as the statute applies in a nondiscriminatory manner to both treaty and nontreaty persons.
 
 
 29
 1. Surrounding Circumstances and Legislative History
 
 
 30
 The government relies on United States v. Fryberg, 622 F.2d 1010 (9th Cir.1980) to support its contention that we should look to surrounding circumstances and legislative history for evidence of congressional intent to abrogate. In Fryberg, the court upheld a treaty-Indian defendant's conviction for taking a bald eagle in violation of the Eagle Protection Act. The court agreed with White that "neither the Act's statutory language nor its legislative history expressly state that Indian treaty rights were to be abrogated." Id. at 1013. However, the court found that White's express reference requirement was too rigid, stating:
 
 
 31
 Congressional intent may be "clear from surrounding circumstances and legislative history", despite the absence of a Congressional expression on the "face of the Act" to abrogate or modify treaty rights. See Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 588 n. 4 [97 S.Ct. 1361, 1364 n. 4, 51 L.Ed.2d 660] (1977). "In all cases, the 'face of the Act', the 'surrounding circumstances', and the 'legislative history', are to be examined with an eye towards determining what Congressional intent was." [Citing Mattz v. Arnett, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973) ]. Id. 430 U.S. at 587 [97 S.Ct. at 1363].
 
 
 32
 Id.
 
 
 33
 In Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), a civil case, the Court held that certain congressional acts were effective to diminish the boundaries of the Rosebud Sioux Reservation. The Court noted that express language in an act is not the only method of terminating or diminishing a treaty reservation. Id. at 588 n. 4, 97 S.Ct. at 1364 n. 4. But, even in Kneip, the Court found that "cession language which * * * [had been] * * * found to be 'precisely suited' to disestablishment" was used by Congress in the "crucial" diminishment Act. Id. (quoting DeCoteau v. District County Court, 420 U.S. 425, 445, 95 S.Ct. 1082, 1093, 43 L.Ed.2d 300 (1975)).
 
 
 34
 We shall continue to follow the express reference test established in White to cases involving criminal violations of the Eagle Protection Act and shall apply the same test to cases involving criminal violations of the Endangered Species Act. By "express reference" we refer to an express reference in either the Act itself or in the legislative history to the Act. Our decision is compelled by two factors. First, the express reference test is more desirable than the "surrounding circumstances and legislative history" test, as it leads to greater clarity and more consistent results.[12] Second, as we stated in White, the clarity provided by the express reference test is critical where criminal sanctions may be imposed.[13] We apply the express reference test to both of the statutes involved in this case for the simple reason that the factors compelling our adherence to the test are applicable to each of the statutes.
 
 2. Conservation Regulations
 
 35
 The government relies on two lines of Supreme Court cases dealing with state regulation of Indian fishing rights to support its contention that, where necessary in the interest of conservation, the federal government may regulate Indian treaty hunting and fishing rights, as long as the statute applies in a nondiscriminatory manner to both treaty and nontreaty persons. See United States v. Fryberg, supra, 622 F.2d at 1015.
 
 
 36
 First, the government cites New York ex rel. Kennedy v. Becker, 241 U.S. 556, 36 S.Ct. 705, 60 L.Ed. 1166 (1916). In Kennedy, a state conservation law prohibiting the taking of fish without a permit was held to apply to Indians on nonreservation land despite a treaty granting the Indians a right to fish on the land. The Court stated:
 
 
 37
 It has frequently been said that treaties with the Indians should be construed in the sense in which the Indians understood them. But it is idle to suppose that there was any actual anticipation at the time the treaty was made of the conditions now existing to which the legislation in question was addressed. Adopted when game was plentiful--when the cultivation contemplated by the whites was not expected to interfere with its abundance--it can hardly be supposed that the thought of the Indians was concerned with the necessary exercise of inherent power under modern conditions for the preservation of wild life. But the existence of the sovereignty of the State was well understood, and this conception involved all that was necessarily implied in that sovereignty, whether fully appreciated or not. We do not think that it is a proper construction of the reservation in the conveyance to regard it as an attempt either to reserve sovereign prerogative or so to [sic] divide the inherent power of preservation as to make its competent exercise impossible. Rather are we [sic] of the opinion that the clause is fully satisfied by considering it a reservation of a privilege of fishing and hunting upon the granted lands in common with the grantees, and others to whom the privilege might be extended, but subject nevertheless to that necessary power of appropriate regulation, as to all those privileged, which inhered in the sovereignty of the State over the lands where the privilege was exercised.
 
 
 38
 Id. at 563-64, 36 S.Ct. at 707-08 (emphasis added).
 
 
 39
 Second, the government cites a series of cases dealing with state regulation of fishing rights in connection with an Indian treaty right to take fish "in common " with other citizens. First, in Puyallup Tribe v. Department of Game of Washington, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) (Puyallup I ), the Court stated:
 
 
 40
 The right to fish "at all usual and accustomed" places may, of course, not be qualified by the State, * * *. But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians.
 
 
 41
 Id. at 398, 88 S.Ct. at 1728. In Antoine v. Washington, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975), the Court held that "[t]he 'appropriate standards' requirement means that the State must demonstrate that its regulation is a reasonable and necessary conservation measure, * * * and that its application to the Indians is necessary in the interest of conservation." Id. at 207, 95 S.Ct. at 952 (citations omitted).
 
 
 42
 In Department of Game of Washington v. Puyallup Tribe, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) (Puyallup II ), the Court stated:
 
 
 43
 We do not imply that these fishing rights persist down to the very last steelhead in the river. Rights can be controlled by the need to conserve a species; and the time may come when the life of a steelhead is so precarious in a particular stream that all fishing should be banned until the species regains assurance of survival. The police power of the State is adequate to prevent the steelhead from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets.[14]
 
 
 44
 Id. at 49, 94 S.Ct. at 333 (emphasis added). Finally, in Puyallup Tribe, Inc. v. Department of Game of Washington, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) (Puyallup III ) and Washington v. Washington State Commercial Passenger Fishing Vessel Association, supra, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823, the Court determined that the tribe's on-reservation fishing take must be considered in allocating the fishing resource between Indians and non-Indians.
 
 
 45
 We read these cases as establishing only that "in common " treaty rights are subject to conservation regulation. These cases do not provide an alternate method of abrogating treaty rights. Rather, the cases merely interpret the scope of "in common" treaty rights.
 
 
 46
 Indians understood that "in common" treaty rights could be regulated by state governments where necessary to preserve the shared right. See New York ex rel. Kennedy v. Becker, supra, 241 U.S. at 563-64, 36 S.Ct. at 707-08. The treaty rights of the Yankton Sioux to hunt, however, are exclusive rights on the reservation. See Cohen, supra, at 449. The Yankton Sioux would not have understood the treaty as permitting other sovereigns to regulate their exclusive on-reservation treaty hunting rights. Accordingly, the exclusive on-reservation treaty hunting rights of the Yankton Sioux are not subject to conservation regulations unless statutory abrogation of those rights has been effectuated.
 
 
 47
 In conclusion, we reject the government's contentions that we should adopt the surrounding circumstances and legislative history test to the acts in issue, or that we should permit Congress to regulate exclusive, on-reservation treaty hunting rights without abrogating such rights. We shall adhere to the express reference test set forth in White.
 
 C. Application of White Test
 
 48
 In Fryberg, the Ninth Circuit agreed with our determination in White that neither the statutory language nor the legislative history of the Eagle Protection Act expressly stated that Indian treaty rights were to be abrogated or modified. United States v. Fryberg, supra, 622 F.2d at 1013. No changes in the Eagle Protection Act have been made to alter our conclusion in White that Congress has failed to effectively abrogate or modify Indian treaty hunting rights.
 
 
 49
 Congress has also failed to effectively abrogate treaty hunting rights in the Endangered Species Act. We cannot find an express reference to Indian treaty hunting rights showing congressional intent to abrogate or modify such rights in either the statutory language or legislative history of this Act. Nor has the government directed our attention to any such reference.
 
 
 50
 The government argues that an express congressional intent to abrogate Indian treaty hunting rights was exhibited by Congress' rejection of a bill[15] which would have specifically exempted American Indians from the purview of the Endangered Species Act. We reject such a "backhanded" way of abrogating treaty hunting rights of Indians, especially in criminal cases. Failure to pass a bill creating a specific exception for American Indians does not show that Congress expressly intended that the Act would abrogate Indian treaty hunting rights. If Congress wishes to do so it should speak accordingly.
 
 
 51
 Nevertheless, we note that even if we ignore the express reference test and, instead, look for congressional intent to abrogate or modify treaty rights in less reliable sources, we reach the same conclusion. In reference to both acts, the fact that the acts are broadly worded conservation measures[16] is inconclusive as to intent to abrogate Indian treaty rights. The plaudible purpose behind conservation statutes gives rise to strong emotions, especially where bald eagles are concerned, but does not necessarily reveal a congressional intent to eliminate rights protected by federal treaties.
 
 
 52
 In reference to the Eagle Protection Act in particular, the only possible indicator of intent to abrogate is a 1962 amendment which established the authority of the Secretary of the Interior to permit the taking of eagles "for the religious purposes of Indian tribes." 16 U.S.C. Sec. 668a (1982). It has previously been suggested that there was no reason for such an exception unless Congress thought Indians were subject to the Eagle Protection Act. United States v. White, supra, 508 F.2d at 460 n. 3 (Lay, J., dissenting). However, as the majority in White revealed, the religious purposes exception "is not limited to the taking of eagles by Indians or to the taking of eagles on Indian reservations." Id. at 458. In other words, it could have been deemed necessary to permit non-Indians to hunt eagles, on or off a reservation, in order for the Indian tribes to obtain enough eagle parts for their religious needs. In sum, we are unable to discover a congressional intent in the Eagle Protection Act, its legislative history, or the surrounding circumstances, to abrogate Indian treaty rights even if we set aside the express reference requirement.
 
 
 53
 The same is true as to the Endangered Species Act. The only possible indicator of intent to abrogate in the Endangered Species Act is the rejection of a bill which would have specifically excepted American Indians from the purview of the Act. The government posits that rejection of the bill shows that Congress intended that American Indians be subjected to the Act, even when acting within the scope of treaty rights. More plausible explanations exist for rejection of the bill, not the least of which is the possibility that Congress concluded that American Indians are not subject to the Act to the extent they are acting within the purview of a treaty, and that greater protection from the Act was not necessary.
 
 IV. Conclusion
 
 54
 We adhere to White and extend its reasoning to criminal prosecutions under the Endangered Species Act. The defendants possessed a treaty right to hunt on their reservation which has not been abrogated by these acts and it has not been found that they exceeded the purview of this right. On this basis we affirm the dismissal of count 12 against Dwight Dion, Sr. Additionally, because the district court erred in finding that the Endangered Species Act abrogated the defendants' treaty rights, we vacate the convictions on counts 8 and 10 against Dwight Dion, Sr., and count 1 against Lyle Dion. The government is free to retry these defendants on counts 8 and 10 against Dwight Dion, Sr., and count 1 against Lyle Dion. If there is a retrial on these counts the jury must determine, under proper instructions, whether the defendants are members of the Yankton Sioux Tribe; whether the takings occurred on the Yankton Sioux Reservation; and if the takings did occur on the reservation, whether or not the takings were for commercial purposes.
 
 
 55
 We also find that the defendants have no treaty right to sell parts and carcasses of eagles or scissor-tailed flycatchers commercially. Accordingly, we affirm the district court's refusal to dismiss counts 3, 4, 5, 6, 9, 11, 13 and 14 of the indictment against Dwight Dion, Sr., and count 2 of the indictment against Lyle Dion, which counts charged the defendants with selling parts and carcasses of the birds.
 
 
 56
 We remand the nontreaty defenses raised on this appeal to a panel of this court.
 
 
 57
 McMILLIAN, Circuit Judge, with whom BRIGHT and FAGG, Circuit Judges, join, dissenting.
 
 
 58
 I respectfully dissent. I would overrule the holding in United States v. White, 508 F.2d 453, 457-58 (8th Cir.1974), and would instead adopt the analysis of the dissenting opinion, id. at 459-62 (Lay, J., dissenting). Accord United States v. Fryberg, 622 F.2d 1010, 1014 (9th Cir.1980) (Eagle Protection Act, as amended, 16 U.S.C. Sec. 668(a)).
 
 
 
 *
 Chief Judge Donald P. Lay did not participate in this case
 
 
 [1]
 The Honorable John B. Jones, United States District Judge for the Southern District of South Dakota
 
 
 [2]
 "Taking" is defined in the Eagle Protection Act as follows: " 'take' includes also pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, or molest or disturb; * * *." 16 U.S.C. Sec. 668c (1982)
 
 
 [3]
 "Taking" is defined in the Endangered Species Act as follows: "[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. Sec. 1532(19) (1982)
 
 
 [4]
 The other defendants on this appeal, Terry Fool Bull and Asa Primeaux, Sr., do not argue that White shields them from criminal liability. White is not applicable to their case since their allegedly criminal acts were not committed on land reserved to an Indian tribe of which they were members
 
 
 [5]
 The en banc consideration given to this appeal extends only to the viability and applicability of White. The other issues raised by the defendants will be considered by a panel of this court
 
 
 [6]
 Treaty with the Yankton Sioux, Apr. 19, 1858, 11 Stat. 743
 
 
 [7]
 The Supreme Court of South Dakota has determined that an act of Congress in 1894 diminished the size of the original reservation. State v. Williamson, 87 S.D. 512, 211 N.W.2d 182, 184 (1973); Wood v. Jameson, 81 S.D. 12, 130 N.W.2d 95, 99 (1964). See Weddell v. Meierhenry, 636 F.2d 211, 213 n. 2 (8th Cir.1980)
 
 
 [8]
 Likewise, an earlier treaty to which the Yankton Sioux Tribe was a party reserved hunting and fishing rights in the tribes of the Sioux Nation. Treaty of Fort Laramie, Sept. 17, 1851, 11 Stat. 749
 
 
 [9]
 The record reveals that historically, Sioux Indians captured eagles in a religious ceremony for religious purposes. The Indians captured eagles by digging a pit and placing bait on top of a brush cover set over the pit. An Indian would sit in the pit, grab the eagle when it went for the bait, and either strangle it, frighten it to death, or let it go. Although treaties are interpreted primarily by reference to facts existing at the time of signing, the Yankton Sioux would not be limited to the above method of capturing eagles in exercising their treaty-reserved right to hunt eagles. See Cohen, supra, at 447
 
 
 [10]
 The defendants argue that the right to hunt must include the right to sell or otherwise dispose of the catch. The court in Top Sky rejected a similar argument premised upon the personal property rights of a hunter in captured wild animals. United States v. Top Sky, 547 F.2d 486, 488 n. 2 (9th Cir.1976). We agree with the reasoning in Top Sky
 
 
 [11]
 Supreme Court cases dealing with treaty rights of Puyallup and other Northwest Indians to take fish for commercial purposes are distinguishable. In those cases, historical evidence established the existence of commercial fishing prior to and at the time of the treaties. See, e.g., Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 665 n. 7, 99 S.Ct. 3055, 3064 n. 7, 61 L.Ed.2d 823 (1979); Puyallup Tribe, Inc. v. Department of Game of Wash., 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) (Puyallup III ); Department of Game of Wash. v. Puyallup Tribe, 414 U.S. 44, 48, 94 S.Ct. 330, 333, 38 L.Ed.2d 254 (1973) (Puyallup II ); and Puyallup Tribe v. Department of Game of Wash., 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689 (1968) (Puyallup I ). This distinction is supported by the following interpretation of those cases:
 Where Indians engaged in commercial fishing prior to and at the time of their treaties, as was the case in the Northwest and the Great Lakes areas, the treaties will be read to entitle them to fish commercially today.
 * * *
 More recent decisions have affirmed that Indians are entitled to fish commercially in the exercise of both their on- and off-reservation treaty fishing rights, where commercial fishing was traditionally practiced by the Indians.
 Cohen, supra, 446-47 and 465 (emphasis added) (citing Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, supra; Puyallup (II), supra; Puyallup (I), supra ). See also United States v. Top Sky, supra, 547 F.2d at 488 n. 2.
 
 
 [12]
 Felix Cohen's treatise notes:
 A convincing argument has been made that the courts should explicitly adopt [the express language] standard, thereby promoting clarity and maximizing the protections afforded by Indian treaties. Wilkinson & Volkman, supra note 43, at 645-59.
 * * *
 These cases [Rosebud Sioux Tribe v. Kneip, 430 U.S. 584 [97 S.Ct. 1361, 51 L.Ed.2d 660] (1977); DeCoteau v. District County Court, 420 U.S. 425, 447 [95 S.Ct. 1082, 1094, 43 L.Ed.2d 300] (1975) ], however, illustrate the uncertainty of * * * [the surrounding circumstances and legislative history] rule, since the result in any particular case will turn on the weight a reviewing court puts on different indicia of intent in the relevant legislative history. Compare Rosebud Sioux Tribe v. Kneip with Mattz v. Arnett, 412 U.S. 481 [93 S.Ct. 2245, 37 L.Ed.2d 92] (1973). See Wilkinson & Volkman, supra note 43, at 634-45.
 Cohen, supra, at 223, nn. 56 & 57.
 The uncertainty of the surrounding circumstances and legislative history test is also illustrated by its application in the dissent in White and in the Fryberg decision. The dissent in White found sufficient indicia of congressional intent to abrogate treaty hunting rights from "the broad wording and the pervasive [conservation] purpose" of the Eagle Protection Act, which Act would, in the dissent's opinion, "achieve its purpose only if it applies to everyone." United States v. White, 508 F.2d 453, 459, 461 (8th Cir.1974) (Lay, J., dissenting). The court in Fryberg also relied on "the broad purpose of the Act" to support its finding "that Congress intended to modify Indian treaty rights to prohibit the taking of bald eagles, * * *." United States v. Fryberg, 622 F.2d 1010, 1016 (9th Cir.1980).
 Use of the "broad wording and pervasive purpose" of an act as an indicator of congressional intent is manifestly vague and unreliable. Yet, the surrounding circumstances and legislative history test permits the use of such an unreliable indicator.
 
 
 [13]
 This factor clearly distinguishes the dicta in Rosebud Sioux Tribe v. Kneip, supra, 430 U.S. at 588 n. 4, 97 S.Ct. at 1364 n. 4 to the effect that express language of abrogation may not be necessary. In Kneip, no criminal sanctions were threatened by the statutes which diminished the size of the reservation. We note also that the dicta in Kneip rejected the absolute requirement of express language in the act. The express reference test established in White and adhered to today looks for an express reference of abrogation in either the act or its legislative history
 
 
 [14]
 The government relies on this language, which is dicta, as support for its argument that Indian treaty rights do not include the right to hunt a species to extinction. We do not find this argument controlling in this case. First, the dicta was expressed in the context of an "in common", shared treaty right. On-reservation treaty rights such as those involved in this case are exclusive rights. Cohen, supra, at 449. Second, and more importantly, the government has not established or even claimed that the eagle will become extinct if Indians are permitted to take eagles within the scope of their treaty rights. This court is not confronted with the problem of the imminent extinction of a species. Congress may still act if it chooses to do so
 
 
 [15]
 S. 3199, 92nd Cong., 2d Sess. Sec. 5(a) (1972). Instead, Congress limited the express exemption to Alaskan Indians. 16 U.S.C. Sec. 1539(e)(1) (1982)
 
 
 [16]
 The dissent in White and the court in Fryberg relied upon "the broad wording and the pervasive [conservation] purpose" of the Eagle Protection Act to find congressional intent to abrogate. United States v. White, supra, 508 F.2d at 459 (Lay, J., dissenting). See United States v. Fryberg, supra, 622 F.2d at 1016. See also supra, n. 12