# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3800

_____

United States of America

*Plaintiff - Appellant*

v.

Michael D. Brown

*Defendant - Appellee*

_____

No. 13-3801

_____

United States of America

*Plaintiff - Appellant*

v.

Jerry A. Reyes, also known as Otto Reyes

*Defendant - Appellee*

_____

No. 13-3802

_____

United States of America

*Plaintiff - Appellant*

v.

Marc L. Lyons

*Defendant - Appellee*

_____

No. 13-3803
_____

United States of America

*Plaintiff - Appellant*

v.

Frederick W. Tibbetts, also known as Bud Tibbetts

*Defendant - Appellee*

_____

Appeals from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 9, 2014
Filed: February 10, 2015

_____

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

Appellees Michael Brown, Jerry Reyes, Marc Lyons, and Frederick Tibbetts were indicted under the Lacey Act which makes it unlawful to "sell . . . any fish . . . taken, possessed, transported, or sold in violation of . . . any Indian tribal law." 16 U.S.C. § 3372(a)(1). The indictments alleged that appellees had netted fish for commercial purposes within the boundaries of the Leech Lake Reservation in violation of the Leech Lake Conservation Code, then sold the fish. Appellees are Chippewa Indians, and they moved to dismiss the indictments on the ground that their prosecution violates fishing rights reserved under the 1837 Treaty between the United States and the Chippewa. The district court[1] granted the motions to dismiss. The United States appeals, arguing that its application of the Lacey Act did not infringe on appellees' fishing rights. We affirm.

I.

A.

During the early 1800s Chippewa Indians occupied much of present day Minnesota and Wisconsin. Ronald N. Satz, Chippewa Treaty Rights: The Reserved Rights of Wisconsin's Chippewa Indians in Historical Perspective 1 (Carl N. Haywood, ed., 1996). At least three thousand Chippewa resided in seven village centers at locations including Leech Lake. Id. In Minnesota they controlled the land east of the Mississippi River and north of the Crow Wing River. William Watts Folwell, A History of Minnesota 80-81, 88 (Solon J. Buck, ed., 1921).

Hunting, fishing, gathering, and trapping were essential to the survival and ways of life of Indian tribes throughout North America. Cohen's Handbook of Federal Indian Law § 18.01 at 1154 (Nell Jessup Newton ed., 2012). Such activities

---

[1] The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

"were not much less necessary to the existence of the Indians than the atmosphere they breathed." United States v. Winans, 198 U.S. 371, 381 (1905). Throughout their territory the Chippewa fished, hunted, trapped, gathered wild rice, and tapped maple trees for sugar. Satz, Chippewa Treaty Rights at 1-2. Fishing and hunting were of such importance that a boy's first success was publicly celebrated. Id. at 2. In addition to fishing for subsistence purposes, Chippewa Indians sold their catch to traders, from whom they also bought fishing nets. Id. at 29.

The United States made several treaties with Chippewa Indians during the nineteenth century, including two relevant to this case. In July 1837, over one thousand Chippewa Indians gathered at Fort Snelling while their chiefs negotiated with Wisconsin Territorial Governor Henry Dodge who represented the United States. Documents Related to the Negotiation of the Treaty of July 29, 1837, reprinted in Satz, Chippewa Treaty Rights 131-153, at 131 ("1837 Treaty Journal"). The United States sought to purchase land east of the Mississippi River in present day central Minnesota and Wisconsin because of its desirable pine timber. Id. at 131-32, 140.

During these negotiations, the Chippewa chiefs emphasized the importance of reserving their rights to fish, hunt, and gather on the land, also called usufructuary rights. According to the treaty journal, Ma-ghe-ga-bo stated, "Of all the country that we grant to you we wish to hold on to a tree where we get our living, & to reserve the streams where we drink the waters that give us life." 1837 Treaty Journal at 142. The secretary who recorded the proceedings noted that he transcribed the statement as provided by the underqualified interpreters, but he "presume[d] it to mean that the Indians wish to reserve the privilege of hunting & fishing on the lands and making sugar from the Maple." Id. Flatmouth, chief of the Pillager band which resided at Leech Lake, reiterated the importance of reserving usufructuary rights on the ceded lands:

My Father. Your children are willing to let you have their lands, but they wish to reserve the privilege of making sugar from the trees, and getting their living from the Lakes and Rivers, as they have done heretofore, and of remaining in this Country. . . . You know we can not live, deprived of our Lakes and Rivers; . . . we wish to remain upon them, to get a living.

Id. at 145.

Governor Dodge agreed to reserve these rights for the Chippewa Indians. 1837 Treaty Journal at 146. Article 5 of the 1837 treaty provides, "The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers, and the lakes included in the territory ceded, is guarantied to the Indians, during the pleasure of the President of the United States." Treaty with the Chippewa, July 29, 1837, art. 5, 7 Stat. 536 ("1837 Treaty").

The area surrounding the Leech Lake Reservation was not part of the territory ceded in 1837. See 1837 Treaty, art. 1. That reservation was established, and additional territory in northern Minnesota was ceded, in an 1855 treaty. Treaty with the Chippewa, February 22, 1855, art. 1-2, 10 Stat. 1165 ("1855 Treaty"). Several Chippewa chiefs again gathered at Fort Snelling for the negotiations. Documents Related to the Negotiation of the Treaty of February 22, 1855 at 1 ("1855 Treaty Journal), available at http://digital.library.wisc.edu/1711.dl/History.IT1855no287 (last visited Jan. 27, 2015). Colonel George Manypenny, Commissioner of Indian Affairs, represented the United States. Id. According to the treaty journal, the Chippewa chiefs understood the United States to have a straightforward goal. In the words of Flatmouth, chief of the Pillager band residing near Leech Lake, "It appears to me that I understand what you want, and know your views from the few words I have heard you speak. You want land." Id. at 18.

In contrast to the 1837 negotiations, there is no record of a discussion of usufructuary rights, and the treaty is silent on that subject. See 1855 Treaty Journal; 1855 Treaty. Reservations within the ceded territory were negotiated. Flatmouth requested a reservation "at Lake Winn[ibigoshish], Cass Lake, and Leech Lake" and the treaty thus established the Leech Lake Reservation. 1855 Treaty Journal at 29; 1855 Treaty, art. 2.

B.

In more recent years, courts have determined that treaty reservations of usufructuary rights to the Chippewa Indians remain in effect. In Leech Lake Band of Chippewa Indians v. Herbst, 334 F. Supp. 1001 (D. Minn. 1971), the Leech Lake Band sought a declaratory judgment that the state of Minnesota could not regulate fishing, hunting, and gathering wild rice within its reservation. The United States, also a plaintiff, contended "that the treaty protected rights to hunt, fish, trap and gather wild rice are property rights to be used in whatever fashion the Indians, as owners, desire, whether to eat, clothe, or sell." The district court determined that the Chippewa Indians' usufructuary rights had not been terminated by the 1889 Nelson Act, and it enjoined enforcement of state fish and game laws against Indians on the reservation. Herbst, 334 F. Supp. at 1006. The case ended in a settlement in which the Leech Lake Band created its own conservation code and agreed to enforce the code in tribal courts.

A subsequent case involving another band of Minnesota Chippewa Indians made its way to the Supreme Court. Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172 (1999). The state of Minnesota argued that the Mille Lacs Band had lost the hunting, fishing, and gathering rights guaranteed by the 1837 treaty through an executive order in 1850, the 1855 treaty, and Minnesota's admission into the Union in 1858. Id. at 175-76. Analyzing the historical context of the 1855 treaty, the Court concluded that the lack of discussion of usufructuary rights in the

negotiations "suggest[ed] that the Chippewa did not understand the proposed Treaty to abrogate their usufructuary rights as guaranteed by other treaties." Id. at 198. The Court determined that the rights reserved under the 1837 treaty had not been extinguished by the subsequent executive order, 1855 treaty, or admission of Minnesota into the Union. Id. at 195, 202, 208.

C.

In 2010, the Minnesota Department of Natural Resources began "Operation Squarehook," an investigation into illegal sales of game fish, mostly walleye, in northern Minnesota. Minn. Dept. of Natural Res., "Operation Squarehook: Frequently Asked Questions," available at http://www.dnr.state.mn.us/enforcement/op_squarehook_faq.html (last visited January 27, 2015). State law enforcement worked with the U.S. Fish and Wildlife Service and authorities from the Red Lake and Leech Lake Indian Reservations. Id. The investigation focused on allegations that tribal members caught walleye on lakes within the reservations and illegally sold the fish to non Indians at below market rates. Id. Defendants were among over thirty people charged with criminal offenses as a result of the investigation, ten of whom were named in federal court indictments. Id.

The factual allegations against defendants relate to fishing within the Leech Lake Reservation. This reservation includes a number of lakes, such as Leech Lake, Cass Lake, Lake Winnibigoshish, and Six Mile Lake. Brown, Reyes, and Lyons are enrolled members of the Leech Lake Band, and Tibbetts is an enrolled member of the White Earth Band.[2] Both bands are part of the Minnesota Chippewa Tribe, a federally recognized Indian tribe. Indian Entities Recognized and Eligible To

---

[2]The government has not suggested that Tibbetts's membership in the White Earth Band provides him different fishing rights from those of the other defendants.

Receive Services From the United States Bureau of Indian Affairs, 79 Fed. Reg. 4748-52 (January 29, 2014).

The indictments allege that defendants have taken fish by gill net for commercial purposes within the Leech Lake Reservation, violating the band's conservation code. Defendants had then sold the fish to non Indians, some of whom were also indicted. Section 22.01(2) of the conservation code prohibits taking game fish by gill net other than for personal use, and § 23.01 prohibits taking fish for commercial purposes within the reservation, except for non game fish when authorized by a permit from the band's conservation committee. Conservation Code of the Leech Lake Band of Chippewa Indians, §§ 22.01(2), 23.01. Walleye are included in the definition of "game fish." Id. § 11.01(10). Violations of sections 22.01 and 23.01 are punishable in tribal court by a fine of up to five hundred dollars, imprisonment for up to 180 days, both, "or any other penalty as deemed appropriate by the Judge." Id. at § 51.03(1).

Defendants were indicted in the District of Minnesota for violations of the federal Lacey Act, which makes it unlawful to sell fish taken "in violation of any Indian tribal law." 16 U.S.C. § 3372(a)(1). The indictments alleged that defendants had sold fish worth more than $350 knowing the fish were taken in violation of the Leech Lake conservation code. Such a violation is punishable by a fine of up to $20,000, imprisonment for up to five years, or both. 16 U.S.C. § 3373(d)(1).

Defendants moved to dismiss the indictments, arguing that the government could not prosecute them for exercising their right to fish on tribal waters. They claimed that the 1837 treaty reserved this right and that because Congress had not abrogated their treaty right, the indictment must be dismissed. At a hearing on defendants' motions, the United States "agree[d] that there's no issue as to whether the 1837 Chippewa Treaty applies in the Leech Lake region." The government argued

-8-

however that the prosecution did not implicate the defendants' treaty rights because the Lacey Act was a law of general applicability.

While considering these arguments, the district court examined the 1837 treaty and its historical context, including the negotiations between the Chippewa chiefs and Governor Dodge. The court concluded that the statements made in those negotiations demonstrated that all parties understood the 1837 treaty to reserve "a broad right to fish as they had been accustomed — without restriction." This right included selling the fish to make a living and did not limit the method used for catching them. The defendants' alleged actions therefore fell within the protections of the treaty. The district court concluded that the Lacey Act did not abrogate the usufructuary rights reserved under the 1837 treaty. The indictments were dismissed, and the United States appeals.

## II.

### A.

The United States argues that prosecuting defendants under the Lacey Act does not implicate usufructuary rights. In considering that argument we must examine the scope of the rights protected by the 1837 treaty, a treaty the United States admits is applicable. When seeking to determine the meaning of Indian treaties, "we look beyond the written words to the larger context that frames the Treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties." Mille Lacs Band, 526 U.S. at 196 (quotation omitted). We interpret such treaties liberally, resolving uncertainties in favor of the Indians, and we "give effect to the terms as the Indians themselves would have understood them." Id. at 196, 200.

The wording of the 1837 treaty is broad, guaranteeing a "privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers, and the lakes included

in the territory ceded." 1837 Treaty, art. 5. The historical importance of these activities in Chippewa life and the emphasis of the Chippewa chiefs on usufructuary rights during their negotiations with the United States indicate that the Indians believed they were reserving unrestricted rights to hunt, fish, and gather throughout a large territory. This case presents no issue of whether the treaty protection includes the use of new technologies since the Chippewa used nets to catch fish at the time the treaty was made.

The history suggests that the Chippewa Indians' exercise of their usufructuary rights included selling what they hunted, fished, or gathered in order to make a modest living. Other cases considering the 1837 treaty have reached the same conclusion. Mille Lacs Band of Chippewa Indians v. Minnesota, 861 F. Supp. 784, 838 (D. Minn. 1994); Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin, 653 F. Supp. 1420, 1435 (W.D. Wis. 1987). Where "Indians engaged in commercial fishing prior to and at the time of their treaties, as was the case in . . . the Great Lakes area, the treaties will be read to entitle them to fish commercially today." United States v. Dion, 752 F.2d 1261, 1265 n.11 (8th Cir. 1985) (en banc) (quotation omitted), rev'd in part on other grounds, 476 U.S. 734 (1986). Moreover, as recently as the 1970s the United States argued in the Herbst case that usufructuary rights on the Leech Lake Reservation included the right to sell fish. This history, the text of the 1837 treaty, and evidence of the parties' understanding of it show that the treaty guaranteed a broad right to fish that includes right to sell them.

On appeal, the United States attempts to retreat from its earlier admission that the rights reserved under the 1837 treaty apply on the Leech Lake Reservation. It acknowledges that the the Chippewa Indians have on reservation rights "inherent in [the band's] sovereignty" and cites Cohen's Handbook of Federal Indian Law § 18.03[1] at 1158-59. As this treatise notes, "[e]xclusive on-reservation hunting, fishing, and gathering rights are implied from the establishment of a reservation for the exclusive use of a tribe." Id. The Supreme Court has explained that "[a]s a

-10-

general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them . . . [and] [t]hese rights need not be expressly mentioned in the treaty." United States v. Dion, 476 U.S. 734, 738 (1986). Individuals may assert these rights "unless [they] were clearly relinquished by treaty or have been modified by Congress." Id.

The United States suggests no reason why the right to net and sell fish would not be part of the usufructuary rights reserved by the establishment of the Leech Lake Reservation in the 1855 treaty. The context of the 1855 treaty establishing the Leech Lake Reservation indicates that this "general rule" applies. As the Supreme Court noted in Minnesota v. Mille Lacs Band, the silence regarding usufructuary rights in the 1855 treaty and the negotiations leading up to it suggest that the Chippewa Indians did not believe they were relinquishing such rights. 526 U.S. at 198. Historical sources indicate that the Chippewa practiced such activities during the time period when the reservation was established. Even if the 1837 treaty does not apply, the rights it protects are relevant because in this particular case the Chippewa would have understood similar broad rights to apply on the Leech Lake Reservation. We therefore conclude that the exclusive on reservation fishing rights of the Chippewa Indians protect the rights to fish and to sell fish.

## B.

The United States raises several arguments why the prosecution does not conflict with Chippewa fishing rights reserved under the 1837 treaty or implied by the establishment of the Leech Lake Reservation in the 1855 treaty. First, the government contends that such right is one that may be asserted by a band or tribe, but not by an individual. In support of this argument, the government cites a Tenth Circuit case for the proposition that the right asserted in court proceedings is "the right of an individual of the community," part of the "tribal right to hunt or fish."

United States v. Fox, 573 F.3d 1050, 1053-54 (10th Cir. 2009).

It is well settled, however, that an individual Indian may assert usufructuary rights in a criminal prosecution. For example, the Supreme Court stated in United States v. Dion that hunting and fishing "treaty rights can be asserted by Dion as an individual member of the Tribe." 476 U.S. at 738 n.4. Evaluating usufructuary rights in United States v. Winans, the Court explained that while "the negotiations were with the tribe," treaties "reserved rights, however, to every individual Indian, as though named therein." 198 U.S. at 381.

Fox does not help the government's argument in this case. The defendant in Fox, a Navajo Indian and a convicted felon, was prosecuted under 18 U.S.C. § 922(g) for possessing a shotgun and rifle on the Navajo Reservation, even though he claimed to possess the guns solely for hunting. 573 F.3d at 1051. Although the Tenth Circuit was "skeptical of the [government's] position that hunting rights guaranteed by treaty only benefit the tribe collectively, as opposed to its individual members," id. at 1053, it decided that Fox was ineligible to assert a treaty hunting right because the treaty provided that Navajo Indians who commit crimes may be "tried [by the United States] and punished according to its laws." Id. at 1054-55. Part of Fox's punishment was the loss of the privilege to possess firearms. Id. The present case is easily distinguishable, for defendants here are not subject to any prior federal criminal punishment prohibiting the use of gill nets for commercial fishing.

The United States also argues that this Lacey Act prosecution supports rather than undermines tribal sovereignty because it is predicated on a violation of the Leech Lake Band's conservation code. Since defendants allegedly fished in ways prohibited by the band, usufructuary rights do not protect them, the government contends. The government does not, and cannot, cite any authority for the proposition that the Leech Lake Band's fishing regulations have altered the scope of rights protected in the 1837 treaty or by the establishment of the reservation in the 1855 treaty. Whether or not

-12-

a Lacey Act prosecution in this case could promote tribal sovereignty, a tribe does not abrogate its own rights by electing to regulate those rights. Tribal fishing laws enforceable in tribal court do not change the scope of treaty protections which tribal members may assert as a defense to prosecution by the United States.

Finally, the United States also relies on a Ninth Circuit case holding that Indians could be prosecuted for taking fish within Indian Country in violation of tribal regulations. United States v. Sohappy, 770 F.2d 816 (9th Cir. 1985). The Ninth Circuit described the "crucial issue" there as "whether the treaties reserved to the tribes *exclusive* jurisdiction over enforcement of tribal fishing law against Indians." Id. at 818 (emphasis in original). The court decided that a treaty which reserved the "right to take fish at all 'usual and accustomed places' was not exclusive but was to be shared 'in common with citizens of the Territory.'" Id. at 819. There was no language in the treaty "purporting to exempt Indians from the laws of general applicability throughout the United States." Id. at 820 (quotation omitted). In such circumstances, the Ninth Circuit concluded, concurrent federal jurisdiction over fishing did not violate treaty rights. Id. at 819-20.

An affirmance of the district court in this case does not conflict with Sohappy because that case evaluated rights under a particular treaty with materially different language and parties. The Supreme Court has instructed courts to analyze the history, purpose, and negotiations of the treaty at issue in a particular case. See Mille Lacs Band, 526 U.S. at 202. The Ninth Circuit determined in Sohappy that a right to take fish "in common with citizens of the Territory" was not an exclusive right. 770 F.2d at 819. In contrast, the 1837 treaty applicable here reserves broad usufructuary rights with no such limiting language, and the on reservation rights implied in the 1855 treaty are exclusive. These are critical differences which distinguish the case before our court.

-13-

The United States nonetheless urges that its Lacey Act prosecutions are valid because the treaty does not "exempt Indians from the laws of general applicability throughout the United States." Sohappy, 770 F.2d at 820. Because the activity for which defendants were prosecuted (selling fish they caught on the Leech Lake Reservation) falls within the scope of the Chippewa Indians' exclusive usufructuary rights, we need not now consider whether the 1837 treaty exempted the Chippewa from other laws of general applicability. This conclusion is consistent with our decision in United States v. White, 508 F.2d 453 (8th Cir. 1974).

In White, we affirmed the dismissal of an indictment against a member of the Red Lake Band for violating the Eagle Protection Act, 16 U.S.C. § 668(a), by shooting at a bald eagle on the reservation. Id. at 454. We stated there that "areas traditionally left to tribal self-government, those most often the subject of treaties, have enjoyed an exception from the general rule that congressional enactments, in terms applying to all persons, includes Indians and their property interests." Id. at 455. After determining that the Red Lake Band had reserved hunting rights, the court continued, "To affect those rights, then, by 16 U.S.C. § 668, it was incumbent upon Congress to expressly abrogate or modify the spirit of the relationship between the United States and Red Lake Chippewa Indians on their native reservation." Id. at 457-58. As Congress had not so acted, the court concluded, the district court had properly dismissed the indictment. Id. at 458-59.

Other treaty rights decisions show that White furnishes the correct analysis for the issues presented here. In United States v. Dion which was decided after Sohappy, the Supreme Court also employed an abrogation analysis when determining whether treaty rights precluded prosecution of a Yankton Sioux Indian under the Eagle Protection Act. 476 U.S. at 737-39. Later in United States v. Gotchnik, we again evaluated the scope of treaty protections and whether Congress abrogated those protections when determining that treaty fishing rights did not preclude federal

prosecution for using motor vehicles in the Boundary Waters Canoe Area Wilderness. 222 F.3d 506, 508-11 (8th Cir. 2000).

The United States points out that two of our cases have cited Sohappy. United States v. Stone, 112 F.3d 971, 973-74 (8th Cir. 1997); United States v. Big Eagle, 881 F.2d 539, 540 n.1 (8th Cir. 1989). In neither of these cases is it clear that the Indian defendants were prosecuted for actions that fell within their treaty hunting and fishing rights. Stone was charged with violating the Airborne Hunting Act within Indian country by using a plane to drive a moose toward hunters on the ground. Stone, 112 F.3d at 972. The hunters were not prosecuted. See id. Big Eagle was charged with taking fish on the reservation of a tribe to which he did not belong in violation of that tribe's rules. Big Eagle, 881 F.2d at 539-40. Neither decision considered the history, purpose, and negotiations of a treaty claimed to protect the defendant's actions. See Stone, 112 F.3d at 973-74; Big Eagle, 881 F.2d at 540. Moreover, even if these cases were to conflict with White, we would be obligated to follow White as the earliest case on point. Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (en banc).

After giving full consideration to the arguments by the United States, we conclude that appellees are entitled to assert the Chippewa Indians' fishing rights and that this prosecution under the Lacey Act conflicts with those rights.

III.

Although Congress may abrogate Indian treaty rights, it must make its intention to do so "clear and plain." Dion, 476 U.S. at 738. There must be "clear evidence that Congress actually considered a conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." Id. at 740. The United States does not argue that Congress abrogated Chippewa fishing rights through the Lacey Act. That Act itself makes clear that Congress did *not* intend to abrogate Indian rights: it provides that

-15-

[n]othing in this chapter shall be construed as . . . repealing, superseding, or modifying any right, privilege, or immunity granted, reserved, or established pursuant to treaty, statute, or executive order pertaining to any Indian tribe, band, or community.

16 U.S.C. § 3378(c)(2).  Congress has thus not abrogated the rights asserted by defendants.

## IV.

We conclude that the historic fishing rights of the Chippewa Indians bar this prosecution of defendants for taking fish within the Leech Lake Reservation and selling them.  The judgment of the district court is affirmed.

_____